HASTINGS ASSOCIATES, INC. *vs.* LOCAL 369 BUILDING FUND, INC.

No. 94-P-219.

Norfolk. October 11, 1995. - January 31, 1997.

Present: BROWN, GREENBERG, & FLANNERY, JJ.

*Practice, Civil,* Judgment notwithstanding verdict. *Real Property,* Lease. *Contract,* Lease of real estate, Construction of contract, Performance and breach, Legality. *Evidence,* Value, Relevancy and materiality. *Alcoholic Liquors,* License. *License. Public Policy. Consumer Protection Act,* Lease. *Words,* "Enhanced value."

A renewal provision in a lease agreement was not an unenforceable agreement to agree, where the only element not agreed upon was the selection of a mutually agreeable neutral third party who would value the property for purposes of a buy-back if the parties could not agree to the terms of a renewal. [168-170]

A provision in a lease agreement calling for the lessor to pay the lessee the "enhanced value" of the property at the end of the lease period was not so vague as to make that provision unenforceable. [170-171]

In an action alleging breach of a lease agreement in which the jury found that the plaintiff performed its obligations and the defendant repudiated its obligations, and those findings were supported by the evidence, the judge erred in ruling on the defendant's motion for judgment notwithstanding the verdict that the plaintiff was not excused from performance of the remainder of the contract. [171]

At the trial of a claim for breach of a lease agreement, the evidence supported the jury's determination of damages and the judge erred in ruling otherwise in granting the defendant's motion for judgment notwithstanding the verdict. [171-173]

A lease agreement predicated on the transfer of the lessor's liquor license to the lessee in violation of G. L. c. 138, §§ 2 and 23, rendered the lessee's performance under the contract illegal: the lessee was not entitled to recover from the lessor upon the termination of the lease the "enhanced value" of the liquor selling business pursuant to a buy-out provision in the lease, where the increased value was inseparable from the lessee's improper use of the license to generate that value. [173-179]

In an action alleging violation of G. L. c. 93A, the evidence supported the judge's findings and his conclusion that the plaintiff had failed to establish a claim under that statute. [179-180]

CIVIL ACTION commenced in the Superior Court Department on January 11, 1991.

The case was tried before *Patrick F. Brady*, J.

*Evelyn V. Henry* for the plaintiff.

*Evan T. Lawson* for the defendant.

FLANNERY, J. The plaintiff brought this action against the defendant by complaint alleging breach of a lease agreement (count II) and a violation of G. L. c. 93A, §§ 2 and 11 (count VIII).[1] In answer to special questions, a Superior Court jury found, among other things, that the plaintiff performed its obligations under the lease agreement, that the defendant repudiated its obligations thereunder, and that the plaintiff sustained damages of $175,000. Having reserved the c. 93A claim, the trial judge made findings for the defendant. Subsequently, the judge allowed the defendant's motion for judgment notwithstanding the verdict.[2] Both parties have appealed. We affirm the judgment notwithstanding the verdict, although not on the grounds relied upon by the judge. See *Ezekial* v. *Jones Motor Co.*, 374 Mass. 382, 390 (1978); *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 572 (1986).[3] We also affirm the judgment on the c. 93A count.

In reviewing the propriety of a judgment notwithstanding the verdict, we consider facts in the record in the light most

[1]The plaintiff expressly waived all remaining counts of the complaint at trial, and the judge deemed the defendant's counterclaim to have been waived. The defendant does not contest this on appeal.

[2]Alternatively, in the event of an appellate reversal, the judge granted the defendant's motion for a new trial limited to damages unless the plaintiff accepted a remittitur of $129,310. In view of our decision, we need not reach the propriety of this ruling. But see note 18, *infra*.

[3]Where, as here, a judge allows both a motion for judgment notwithstanding the verdict and conditionally allows a motion for a new trial, the party who obtained the favorable verdict may appeal both the judge's actions, as the latter is contingent upon appellate reversal of the judgment notwithstanding the verdict; the party whose motion for a new trial was conditionally allowed is not aggrieved for purposes of appeal unless and until the party who obtained the verdict accepts a remittitur, if any, or until final disposition after the new trial. See *Okongwu* v. *Stephens*, 396 Mass. 724, 728-729 & n.7 (1986). Thus, the defendant's appeal from the order conditionally allowing its motion for new trial is premature, and must be dismissed. See, e.g., *DiCicco* v. *Berwick*, 27 Mass. App. Ct. 312, 315 (1989). Although the defendant also purports to appeal the judge's failure to consider an additional ground for allowance of its motion for judgment notwithstanding the verdict, no appeal is necessary. We shall affirm the allowance of such a motion if any valid basis exists, even if the judge's decision was predicated upon incorrect grounds. *Ezekial* v. *Jones Motor Co.*, *supra*. *Service Publications, Inc.* v. *Goverman*, *supra*.

favorable to the plaintiff and to the verdict which it obtained. See *Tobin* v. *Norwood Country Club, Inc.*, 422 Mass. 126, 127 (1996). From 1978 to 1982, the defendant operated a function hall business for its union membership under the name of King's Hill, located at 120 Bay State Drive in Braintree (the "premises"). The primary source of revenue for the business was the sale of alcoholic beverages, which was conducted pursuant to a club license which the defendant had obtained pursuant to G. L. c. 138, § 12.[4] In 1982, the defendant offered two employees, Janet Donahue, a cocktail waitress, and Edward Hastings, a bartender, the opportunity to take over the business. Pursuant to a preliminary agreement with the defendant in August, 1982, Donahue and Hastings assumed full control of the business on a trial basis, ostensibly operating pursuant to the defendant's club liquor license.

Donahue and Hastings incorporated the plaintiff for the purpose of running the business. In April, 1983, the plaintiff, as lessee, and the defendant, as lessor, entered into a fully negotiated written agreement concerning the premises for a term of seven years, beginning April 1, 1983. Pursuant to the agreement, the rent was $48,000 per year and the plaintiff agreed to pay the defendant five percent of all gross liquor receipts on sales in excess of $200,000 per year. The defendant also agreed to sell to the plaintiff for $70,000 "the trade furnishings and fixtures associated with King's Hill" as set forth in an attached schedule, and the parties agreed that the plaintiff would have exclusive use of the "King's Hill" name.[5]

---

[4]Section 12 provides, in pertinent part: "Any club in any city or town wherein the granting of licenses to sell alcoholic beverages, or only wine and malt beverages, as the case may be, is authorized under this chapter may be licensed by the local licensing authorities, subject to the approval of the commission, to sell such beverages to its members only, and also, subject to regulations made by the local licensing authorities, to guests introduced by members, and to no others." The definition of "club" is found in G. L. c. 138, § 1. See *Fairview Auditorium Corp.* v. *Fairview Auditorium Club, Inc.*, 331 Mass. 594, 595-596 (1954). The plaintiff is not a club within the meaning of this definition.

[5]Although the agreement provides that the purchase price of $70,000 was for "the trade furnishings and fixtures associated with King's Hill," the parties consistently referred to this amount as the purchase price of the business.

The agreement also contained a severability clause and a "renewal provision," as follows:

### 37. *RENEWAL NEGOTIATIONS*

> Both parties agree to discuss renewal of this Lease at the end of five (5) years. If either party does not intend to renew this Lease, then that party shall give two (2) years written notice of its intention to the other. If the parties decide not to renew the Lease, then at the conclusion of the Lease, the LESSEE will be reimbursed for the enhanced value of King's Hill, including investment and goodwill, based upon a formula acceptable to both parties. If the parties cannot agree on a mutually acceptable formula, then a third party, acceptable to both . . . [parties], will determine the formula and enhanced value of King's Hill. That formula will be binding on both parties.[6]

The plaintiff operated the King's Hill business from April, 1983, through December, 1990.[7] During that period, the gross sales of the business increased from approximately $200,000 to a high of $640,000 in 1988, ending at $528,000 in 1990. The plaintiff applied for a public liquor license which the town of Braintree denied in June, 1983. The plaintiff's principals were told by the defendant's principal, Donald Wightman, that he had checked with the defendant's attorneys and that the plaintiff could continue to use the defendant's club license, which the plaintiff did.[8]

In 1988, the parties commenced negotiations for renewal of

---

[6]With the defendant's assent, the plaintiff's attorney (who was not trial counsel) added this provision to protect the plaintiff's principals in the event that the lease was not renewed. There was evidence that this was so that the principals would recover at least the initial monies they invested in the business, plus whatever enhanced value there was in the business from future bookings. There was no additional discussion of this provision at the time the parties executed the lease agreement, which occurred after a careful reading of the agreement by counsel for both parties.

[7]On the c. 93A count, the trial judge found that, although the lease agreement expired by its terms on March 31, 1990, the parties continued to operate as if that agreement continued in effect through December, 1990. Neither party contests this finding on appeal.

[8]In January, 1990, the issue of whether the defendant's club license had been transferred to the plaintiff without authority in violation of G. L. c. 138, § 23, was raised before the Alcoholic Beverages Control Commis-

the lease. These negotiations continued until 1990 and were ultimately unsuccessful. In August, 1990, the plaintiff requested reimbursement of $250,000 under the renewal provision. The defendant did not respond orally or in writing with a counterproposal, in part because Wightman felt that the plaintiff's request was outrageous and because he thought that the lease agreement had lapsed. The defendant did not make a determination in 1990 of the value of the business.

The plaintiff continued to occupy the leased premises and run the business until December, 1990. By letter to the ABCC dated December 17, 1990, counsel for the plaintiff requested that the ABCC schedule a hearing concerning the defendant's club license "to allow . . . [the plaintiff] to present serious concerns about the ability of . . . [the defendant] to operate under said license given its pattern of alleged deception before the ABCC and with my client." As grounds therefor, plaintiff's counsel referred to the backdating of the management agreement and the defendant's failure to reimburse the plaintiff under the renewal provision. The defendant then gave notice to the plaintiff that the defendant would not renew the lease agreement and that the lease agreement was terminated. This action followed.

At trial, each party offered the testimony of a certified public accountant on the issue of valuation. The plaintiff's expert witness testified that he interpreted "enhanced value of King's Hill, including investment and goodwill," as used in the renewal provision, to mean the value of the business as of December 31, 1990, based upon the plaintiff's total investment and a calculation of goodwill. As the basis for his opinion, the witness included the plaintiff's original investment of $70,000, its additional investment of approximately $44,000 for fixed assets, and a calculation of goodwill of $45,690, concluding that the value of the business was $160,000. The defendant's expert witness focused upon cash flow and earnings (which showed that the plaintiff lost money during each year of its operation), goodwill, and the value of

sion ("ABCC"). In anticipation of this, the parties executed a management agreement, backdated to April of 1983, in an attempt to comply with ABCC requirements. By decision dated May 17, 1990, the ABCC found that the transfer of the privilege of the license was unauthorized notwithstanding the management agreement and that the licensee, i.e., the defendant, violated § 23. The ABCC gave the defendant three months from the date of its decision to clear the defects in the record.

other assets of the business. He gave his opinion that, as of December 31, 1990, the plaintiff's business had no value. In addition to the experts' testimony, the jury heard testimony from one of the plaintiff's principals, elicited by counsel for the defendant on recross-examination, that the plaintiff's business was worth approximately $90,000 more than plaintiff's expert's opinion of $160,000 (i.e., $250,000).

In a charge conference, the judge indicated that he was going to instruct the jury that the term "enhanced value" meant "the value over and above such value as the business had . . . [when the] lease commenced." Plaintiff's counsel objected, asserting that "enhanced value" meant "whatever the increased value of the business was," i.e., the total value as enhanced or increased, and stating that she did not want the jury to get the impression that "you have to deduct out what the value was to begin with." The judge overruled the objection, essentially ruling that the agreement was unambiguous. Subsequently, in her closing argument, plaintiff's counsel urged an alternative theory of damages based upon the methodology, including gross sales, which the parties had used in establishing a value of the business prior to the lease. Consistent with the judge's ruling that "enhanced value" meant only the increase in value, plaintiff's counsel argued that the value of the business in 1990 was $250,000, that it had been worth $70,000 in 1982-1983, and thus that the jury could find that the increase in value was $180,000.

In answer to special questions, the jury found that the parties did not intend the management agreement to supersede their obligations under the lease, that the plaintiff performed its obligations under the lease, that the defendant repudiated its obligations under the lease, and that the plaintiff sustained damages of $175,000.

On the c. 93A count, the judge found that the plaintiff's initial payment of $70,000 had not been made for "the business," but rather was solely for specific fixtures and furnishings as set forth in the lease agreement. The judge found that the plaintiff did not run the King's Hill business well, that the plaintiff chronically paid its rent and income and meals taxes late, and that it lost money in each year of the lease. The judge also found that the precipitating event for termination of the renewal negotiations was plaintiff's counsel's letter to the ABCC, and that prior thereto, the plaintiff never called

upon the defendant to select a third party to determine the formula for "enhanced value" under the renewal provision. The judge found that the plaintiff's expert witness was not credible, credited the testimony of the defendant's expert witness to the effect that the business was insolvent, and found that the business had no enhanced value.[9] Finally, the judge found that nothing that the defendant did rose to the level of a c. 93A violation.

In allowing the defendant's motion for judgment notwithstanding the verdict on the contract count, the judge concluded (1) that the renewal provision was unenforceable as an agreement to agree, (2) that it was too vague to enforce insofar as it called for payment of "enhanced value," (3) that the plaintiff never invoked so much of the renewal provision as required the defendant to select a third party to value the business, and (4) that there was insufficient evidence that King's Hill had any "enhanced value" at the end of the lease, and thus no basis for the jury's determination.

The plaintiff argues that the judge erred in allowing the defendant's motion for judgment notwithstanding the verdict. We address in turn each of the grounds relied upon by the judge.

1. *Agreement to agree.* Relying upon *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216-217 (1935), the judge first concluded that the renewal provision constitutes an unenforceable agreement to agree. As grounds therefor, the judge asserted that the defendant had no obligation to accept any third party to determine a formula to calculate "enhanced value" under the renewal provision. While this may be so, we disagree with the judge's conclusion that this renders the agreement unenforceable. Pursuant to the renewal provision, the parties essentially had agreed that, in the event of a dispute, a neutral third party would determine the requisite formula, the only element having been left undetermined being the identity of a third party who was mutually agreeable to both parties.[10] Compare *Cataldo* v. *Zuckerman*, 20 Mass. App. Ct. 731, 737-738 (1985). Contrast *Bell* v. *B. F. Goodrich*

_____

[9]The judge found that there was no evidence upon which the court could arrive at the value of the King's Hill business when the lease commenced, "an obvious and necessary component of any enhanced value calculation."

[10]We reject the defendant's argument that the renewal provision is unenforceable because the parties had not agreed to the formula for valua-

*Co.*, 359 Mass. 763 (1971); *Schwanbeck* v. *Federal-Mogul Corp.*, 412 Mass. 703, 705-707 (1992). We do not think this such an element of uncertainty so as to defeat the plaintiff's claim, particularly where it is evident that the parties otherwise intended to be bound, and commonly employed practices exist for selecting a neutral third party to determine value.[11] Even were this not the case, however, we think it clear that the parties did not intend that the plaintiff's entitlement to reimbursement, if any, should be left entirely to the defendant's willingness to agree upon an impartial third party. See *Eno* v. *Prime Mfg. Co.*, 314 Mass. 686, 690 (1943). "We are not here concerned with the future enforcement of this agreement. What [the defendant] claims by [arguing that the agreement is unenforceable] is a right to avoid [its] obligation under the agreement after having accepted its benefits. The law recognizes no such right. To the contrary, '[w]hen a contract has been executed on one side, the law will not permit the injustice of the other party retaining the benefit

---

tion. The parties anticipated the possibility of disagreement as to valuation methodology and provided for that contingency by agreeing that a third party would determine the proper valuation formula. We note here as well that implicit in the lease agreement is a covenant of good faith and fair dealing, see *Starr* v. *Fordham*, 420 Mass. 178, 184 (1995); *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995); *Cherick Distribs., Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 127 (1996), which would extend to the selection of such a third party. See also *Barber* v. *Fox*, 36 Mass. App. Ct. 525, 531 & n.6 (1994).

[11]Compare the somewhat more elaborate process for valuation of stock as part of the appraisal remedy for a minority stockholder as found in G. L. c. 156, § 46. Section 46 provides, in pertinent part: "If the corporation and the stockholder cannot agree upon the value of the stock at the date of such sale, lease, exchange or change, such value shall be ascertained by three disinterested persons, one of whom shall be named by the stockholder, another by the corporation and the third by the two thus chosen." In the analogous context of valuation of real estate, "[a] client or employer may retain or employ a state-certified general real estate appraiser, state-certified residential real estate appraiser or state-licensed real estate appraiser to act as a disinterested third party in rendering an unbiased estimate of value or analysis." G. L. c. 112, § 191 (inserted by St. 1991, c. 168, § 2). Also, although the lease agreement does not contain an arbitration clause and thus arbitration principles are inapplicable to this case, we note that it is not uncommon in commercial contexts for parties to consent in advance to arbitrate disputes and to be bound by the honest judgment of an impartial tribunal. See *Glenn Acres, Inc.* v. *Cliffwood Corp.*, 353 Mass. 150, 154 (1967); *Danvers* v. *Wexler Constr. Co.*, 12 Mass. App. Ct. 160, 163 (1981).

without paying *unless compelled by some inexorable rule.'* "[12]
*Coz Chem. Corp.* v. *Riley,* 9 Mass. App. Ct. 564, 568 (1980),
quoting from *Silver* v. *Graves,* 210 Mass. 26, 30 (1911)
(emphasis supplied). See *Cygan* v. *Megathlin,* 326 Mass. 732,
735 (1951). While the parties may not have foreseen their
extended negotiations pursuant to the renewal provision, it is
altogether implausible that the parties contemplated that, af-
ter seven years, the defendant would be able to reacquire the
King's Hill business for nothing because the parties at the
time of contracting had not worked out a proper formula for
a buy-back. Compare *Eno* v. *Prime Mfg. Co., supra* at 690-
691.

2. *Vagueness of "enhanced value."* "All the essential terms
of a contract must be sufficiently definite so that the nature
and extent of the obligations of the parties can be ascertained.
[Citation omitted.] However, a contract is not to be held
unenforceable 'if, when applied to the transaction and
construed in the light of the attending circumstances,' the
meaning can be ascertained with reasonable certainty." *Si-
mons* v. *American Dry Ginger Ale Co.,* 335 Mass. 521, 523
(1957), quoting from *Cygan* v. *Megathlin, supra* at 734. "Even
if an aspect of an agreement is informal, obscure, difficult of
satisfactory interpretation, and the subject of dispute by the
parties as to its meaning, a court should '[s]o far as reason-
ably practicable . . . give[ ] a construction which will make it
a rational business instrument and will effectuate what ap-
pears to have been the intention of the parties.' " *Finn* v. *Mc-
Neil,* 23 Mass. App. Ct. 367, 372 (1987), quoting from *Bray*
v. *Hickman,* 263 Mass. 409, 412 (1928). Notwithstanding the
parties' varying interpretations of the meaning of "enhanced
value," we think that "this is not a case where 'the promise
given and relied on was so vague that it can be given no ef-
fect.' " *Simons* v. *American Dry Ginger Ale Co., supra* at 524.
Compare *Delorafano* v. *Delafano,* 333 Mass. 684, 687 (1956),
where the court held that an agreement to increase wages if
business should improve did not fail for indefiniteness. Cf.
*Finn* v. *McNeil, supra* at 372-373 (interpretation of "capital
improvements"). The judge's reliance upon *Held* v. *Zam-
parelli,* 13 Mass. App. Ct. 957, 958 (1982), is misplaced. In
that case, among other things, the parties did not agree to the
purchase price, which was to be based upon "one-fourth of

---

[12]See part 5 of this opinion, *infra.*

the profits from the operation of the premises," and, unlike the case at bar, had not agreed that a third party was to determine how the profits were to be computed in the event that the parties disputed the point.

3. *Failure to invoke renewal provision.* The judge also ruled that, even if the defendant had an obligation to negotiate and select a third party in good faith to determine the formula for valuing the business, the plaintiff never invoked this portion of the renewal provision and could not rely upon it. This was error.

A material breach of contract by one party excuses the other party from performance as matter of law. *G.M. Abodeely Ins. Agency, Inc.* v. *Commerce Ins. Co.*, 41 Mass. App. Ct. 274, 278 (1996). Whether there is such a material breach is a question for the jury. *Id.* at 279. Here, the jury found that the plaintiff performed its obligations under the lease agreement and that the defendant repudiated its obligations. These findings, while not compelled, are supported by the evidence and are thus dispositive. Once the defendant indicated to the plaintiff that the defendant would not fulfil its obligations, the defendant was in default and the plaintiff was not obliged to go through the "empty ceremony" of selecting a third party to determine the formula for valuing the business. *Penta* v. *Concord Auto Auction, Inc.*, 24 Mass. App. Ct. 635, 641 (1987), quoting from *Schilling* v. *Levin*, 328 Mass. 2, 5 (1951).

4. *Sufficiency of the evidence.* In ruling that there was insufficient evidence that King's Hill had any "enhanced value" at the end of the lease, the judge focused upon the plaintiff's failure to introduce any evidence of the value of the business at the time the parties entered into the lease, concluding that "[w]ithout that evidence, there was no basis whatsoever for the jury to determine whether the value of the business had, in fact, been enhanced under any formula." We disagree with the judge's analysis in several respects.[13]

As a threshold matter, notwithstanding his ruling that the

---

[13]The judge's conclusion that the payment of $70,000 was not the purchase price for the business is not compelled. There was abundant evidence that the parties considered that this amount was the price which the plaintiff paid to acquire the defendant's business. That the lease agreement specified that this price was for the purchase of furnishings and fixtures is not dispositive (as the judge ruled), because the parties could have allocated the entire purchase price to furnishings and fixtures and nothing to goodwill. Thus, the judge's conclusion that there was *no* evidence of the

term was too vague to enforce, the judge ruled that "enhanced value" was unambiguous. The interpretation of a written contract is a question of law, *Lexington Ins. Co.* v. *All Regions Chem. Labs, Inc.*, 419 Mass. 712, 713 (1995), "except to the extent disputed facts bear upon such interpretation[,]" *USM Corp.* v. *Arthur D. Little Syss., Inc.*, 28 Mass. App. Ct. 108, 116 (1989), and the conclusion in a particular case turns largely on the particular language used when viewed against the background of other indicia of the parties' intent. *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995). The judge's conclusion that "enhanced value" meant "the value over and above such value as the business had when the lease commenced" is not compelled as matter of law. Here, there was ample extrinsic evidence, which the jury could have credited, that the parties contemplated that the defendant would reimburse the plaintiff for the plaintiff's entire investment, including its original investment of $70,000, and that the amount of reimbursement was to be the *total* value of the business as enhanced at the end of the lease term, rather than just the amount of the enhancement. This interpretation, which the plaintiff advanced below, is not inconsistent with the language of the renewal provision: "the Lessee will be reimbursed for the enhanced value of King's Hill, including investment and good will."[14]

The defendant argues, however, that the plaintiff failed to

---

value of the business at the time the parties entered into the lease agreement was erroneous. Moreover, " 'a judge has no right to set aside a verdict merely because he himself would have assessed the damages in a different amount.' " *Solimene* v. *B. Grauel & Co.*, 399 Mass. 790, 803 (1987), quoting from *Bartley* v. *Phillips*, 317 Mass. 35, 40 (1944).

[14]The renewal provision contemplates reimbursement for "investment," but is silent as to whether such amount includes original investment or is limited to subsequent investment. The plaintiff's argument that it was entitled to reimbursement for its entire investment gathers some force, however, in that, upon the termination of the lease agreement, the defendant retained the furnishings and fixtures on the premises for no consideration. The jury was not required to accept the defendant's contention that the furnishings and fixtures were worthless, and the judge's conclusion that the lease agreement did not require or contemplate the return of the furnishings and fixtures ignores what actually happened. " 'There is no surer way to find out what the parties meant, than to see what they have done.' " *Tiffany* v. *Sturbridge Camping Club, Inc.*, 32 Mass. App. Ct. 173, 175 n.4 (1992), quoting from *Pittsfield & N. Adams R.R.* v. *Boston & Albany R.R.*, 260 Mass. 390, 398 (1927). In the context of the renewal provision calling for reimbursement, we are not prepared to conclude, as mat-

preserve for appellate review the issue whether it was entitled to the return of its original $70,000 investment. We need not decide the point. The plaintiff does not press the argument on appeal and, in any event, there was sufficient evidence to support the jury's verdict apart from the plaintiff's $70,000 original investment. It is settled law that "[a]n owner of real estate or personal property having adequate knowledge of his property may express an opinion as to its value." *Southwick* v. *Massachusetts Turnpike Authy.*, 339 Mass. 666, 668 (1959). See *Menici* v. *Orton Crane & Shovel Co.*, 285 Mass. 499, 503-504 (1934), and cases cited; *CBI Partners Ltd. Partnership* v. *Chatham*, 41 Mass. App. Ct. 923, 924 (1996). The same rule applies to corporate officers testifying as to corporate property. See *Winthrop Prods. Corp.* v. *Elroth Co.*, 331 Mass. 83, 85 (1954); *Blais-Porter, Inc.* v. *Simboli*, 402 Mass. 269, 273 (1988); *CBI Partners Ltd. Partnership* v. *Chatham, supra* at 925. Nothing of record suggests that Janet Donahue, as a principal of the plaintiff, lacked sufficient knowledge of or familiarity with the business so as to prevent her from giving her opinion of its value as elicited by defendant's counsel, and indeed, quite the contrary appears. Even were this not the case, however, the defendant did not move to strike Donahue's testimony as being without foundation. The evidence thus was probative, and the jury properly could have considered it. See *Pataskas* v. *Judeikis*, 327 Mass. 258, 260 (1951); *Nancy P.* v. *D'Amato*, 401 Mass. 516, 524-525 (1988). See also Liacos, Massachusetts Evidence 93 (6th ed. 1994). The jury's verdict fell within the range of the probative evidence offered by the parties ·and cannot be said to be without evidentiary foundation. See *Moriarty* v. *Stone*, 41 Mass. App. Ct. 151, 155 n.3 (1996).

5. *Illegality.* The defendant presses on appeal the additional argument that the plaintiff's contract claim is barred because the lease agreement was predicated upon an illegal transfer of the defendant's liquor license. The burden of establishing the illegality of the lease agreement is upon the defendant. *Town Planning & Engr. Assocs., Inc.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 744 (1976). On the evidence at trial, we conclude that the defendant met its burden.

Licenses to sell alcoholic beverages are a special privilege

---

ter of law, that the parties contemplated the return of these assets to the defendant without reimbursement.

subject to public regulation and control, *Connolly* v. *Alcoholic Bevs. Control Commn.*, 334 Mass. 613, 619 (1956), for which States have especially wide latitude pursuant to the Twenty-First Amendment to the United States Constitution. *Opinion of the Justices*, 368 Mass. 857, 861 (1975). The procedure for the issuance of licenses to sell alcoholic beverages is set out in G. L. c. 138. Licenses must be approved by both local licensing authorities and the ABCC. G. L. c. 138, §§ 12, 67. See *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 321 (1996). Section 23 of c. 138 provides, in pertinent part: "Any license under this chapter held by an individual, partnership, or corporation may be transferred to any individual, partnership or corporation qualified to receive such a license in the first instance, if, in the opinion of the licensing authorities, such transfer is in the public interest." Section 2 of c. 138 provides, in pertinent part: "No person shall . . . sell . . . alcoholic beverages or alcohol, except as authorized by this chapter[.] . . . Violation of any provision of this section shall be punished except as provided in section twenty-two [for unlawful transportation of alcoholic beverages] by a fine of not less than one hundred nor more than one thousand dollars or by imprisonment for not more than one year, or both." The plaintiff does not seriously dispute that the parties' actions undertaken pursuant to the lease agreement at issue effectively resulted in an illegal transfer of the defendant's liquor license to the plaintiff in violation of G. L. c. 138, §§ 2 and 23.

"[A] transfer of a license occurs when there is a sale of a liquor business and the license is inseparable from the purchase price. *Kennedy* v. *Welch*, 196 Mass. 592, 595 (1907). A transfer of a business takes place when the person introduced to it runs the business for his own account." *Griffin's Brant Rock Package Store, Inc.* v. *Alcoholic Bevs. Control Commn.*, 12 Mass. App. Ct. 768, 771 (1981). Both of these elements are present here. Although the lease agreement did not expressly identify any consideration paid for transfer of the defendant's club license, the plaintiff has consistently maintained that it purchased the defendant's business — predominantly the sale of alcoholic beverages — and, indeed, part of the consideration paid under the agreement was a percentage of profits derived from gross sales of alcoholic beverages above a certain threshold. See *Fairview Auditorium Corp.*

v. *Fairview Auditorium Club, Inc.*, 331 Mass. 594, 596 (1954). In seeking reimbursement for the "enhanced value" of the business under the renewal provision, the plaintiff advances a theory based largely upon an increase in the gross sales of liquor. In the present circumstances, we think the conclusion that there was a de facto transfer of the liquor license as part of the purchase of the business is compelled, and there is no dispute that the plaintiff operated the business for its own account.[15] The plaintiff's performance under the lease agreement called for illegal conduct. Cf. *DeMello* v. *Alcoholic Bevs. Control Commn.*, 411 Mass. 1001, 1001 (1991) (licensee "gave a key to the property to another, abandoned supervisory responsibility over the premises, and, on being informed of the violations of law committed on the premises, took no steps to correct the situation").

This does not end our inquiry, however, for "[o]ur cases warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found." *Town Planning & Engr. Assocs., Inc.* v. *Amesbury Specialty Co.*, 369 Mass. at 746. " '[C]ourts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law[.]' " *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc.*, 422 Mass. at 320, quoting from *Nussenbaum* v. *Chambers & Chambers Inc.*, 322 Mass. 419, 422 (1948). We must examine and weigh all of the circumstances: "what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract . . . ; what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall." *Town Planning & Engr. Assocs., Inc.* v. *Amesbury Specialty Co., supra* at 745-746.

---

[15]The plaintiff's argument in its reply brief to the effect that it only "managed" the liquor license is specious, particularly in view of its admission that the parties' backdated management agreement was a sham. Moreover, the transfer of the privilege of the license was unauthorized and in violation of law notwithstanding the management agreement. See note 8, *supra.* Contrast *Griffin's Brant Rock Package Store, Inc.* v. *Alcoholic Bevs. Control Commn.*, 12 Mass. App. Ct. at 772.

The plaintiff's illegal use of the defendant's license is not incidental to the plaintiff's claim; the "enhanced value" for which the plaintiff seeks reimbursement under the renewal provision is inseparable from the plaintiff's improper use of the defendant's club license used to generate that value. See *Hawes Elec. Co.* v. *Angell*, 332 Mass. 190, 191-192 (1955). As such, we perceive no basis for concluding that the renewal provision is severable. Even though the renewal provision essentially provides for a buyout to restore the parties to a semblance of the status quo ante, its basis lies in the illegal performance. "[A] promise to do anything as a compromise or satisfaction of an illegal bargain itself is illegal. . . . Were the rule otherwise, the parties could, by their private agreement, waive the illegality and evade the prohibition against the original contract." 5 Williston on Contracts § 12.2, at 672 (Lord 4th ed. 1993).[16] We think this element so permeates the parties' transaction as to be controlling, and that the plaintiff cannot establish its case without developing the illegality in the transaction. Compare *Kennedy* v. *Welch*, 196 Mass. at 594-596. Contrast *Bohaker* v. *Koudelka*, 333 Mass. 139, 143 (1955). See 6 Williston, *supra*, § 12.4, at 24 ("one who has participated in a violation of the law will not be allowed to assert in court any right based upon or directly connected with the illegal transaction").

The plaintiff argues, however, that the essence of the renewal provision, as applicable in this instance, is to reimburse the plaintiff, and that it would suffer a substantial forfeiture and the defendant would receive a substantial windfall if the provision is unenforceable. It is true that "justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants." *Town Planning & Engr. Assocs., Inc.* v. *Amesbury Specialty Co., supra* at 747, quoting from 6A Corbin, Contracts § 1512, at 713 (1962). See *Kenyon* v. *Andrews*, 347 Mass. 769 (1964) (alleged failure of insurance broker to obtain license during partnership with licensed broker); *Harness Tracks Sec., Inc.* v. *Bay State Raceway, Inc.*, 374 Mass. 362, 366-367 (1978) (unlicensed detective business); *Joffe* v. *Wilson*, 381 Mass. 47, 55-56 (1980) (certified

---

[16]But see *Kenyon* v. *Andrews*, 347 Mass. 769 (1964), where relief based upon the parties' separate settlement agreement was held not to be barred, despite the alleged illegality of the underlying insurance broker partnership.

public accountant with agreement violating intermediation rule); *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 126 & n.12 (1992) (despite statutory prohibition, unlicensed real estate broker may recover commission on sale of real estate forming part of sale of business); *Business Brokers Intl. Corp.* v. *Roderick*, 24 Mass. App. Ct. 957, 957-958 (1987) (corporate real estate broker's use of unlicensed broker or salesman). See also *Larned* v. *Andrews*, 106 Mass. 435, 439 (1871).[17]

While the cases bespeak a judicial tolerance for relatively insubstantial violations of licensing statutes or regulations, particularly when failure to enforce the contract results in substantial unfairness to one or both contracting parties, "the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases the contract will not be enforced." *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc.*, 422 Mass. at 321. "If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement." Restatement (Second) of Contracts § 181 (1981).

The requirement that a vendor of alcoholic beverages obtain a license from proper authorities is always at least in part for

[17]Also see *Buccella* v. *Schuster*, 340 Mass. 323, 326 (1960) (contractor's failure to obtain bond or permit for blasting); *Valley Stream Teachers Fed. Credit Union* v. *Commissioner of Banks*, 376 Mass. 845, 851-853 (1978) (credit union directors' violation of statute by failing to obtain approval of bank commissioner); *Young* v. *Southgate Dev. Corp.*, 379 Mass. 523, 524-525 (1980) (lawyer's unexecuted contingent fee agreement in violation of disciplinary rule); *Lawrence* v. *Falzarano*, 380 Mass. 18, 23 (1980) (contractor's failure to obtain statutorily required certificate of need for renovation of public health facility); *Guenard* v. *Burke*, 387 Mass. 802, 806-807 (1982) (illegality of attorney's contingent fee agreement); *Reynolds Aluminum Bldg. Prods. Co.* v. *Leonard*, 395 Mass. 255, 259 (1985) (failure to obtain necessary plumbing permit for sale and installation of solar water heating system); *Starr* v. *J. Abrams Constr. Co.*, 16 Mass. App. Ct. 74, 78-81 (1983) (nondisclosure of oral side agreement for payment of cost overruns, in violation of Federal law); *Rooney* v. *Paul D. Osborne Desk Co.*, 38 Mass. App. Ct. 82, 84-87 (1995) (violation of statute barring issuance of corporate stock for future services).

the protection of the public, see Corbin, *supra*, § 1513, at 720, and licenses are issued or denied " 'with a view only to serve the public need . . . in such a manner as to protect the common good.' " *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc., supra* at 322, quoting from G. L. c. 138, § 23. Here, where the plaintiff's application for its own license was denied, the parties by their arrangement effectively substituted their own judgment for that of the local licensing authority. To permit the plaintiff to recover under its illegal arrangement would reward it for its illegal conduct and would contravene public policy by elevating the plaintiff's private interests over those of the public. Although we are cognizant of the "heavy forfeiture" our decision works upon the plaintiff, Corbin, *supra*,[18] and that such a harsh result favors an undeserving and equally culpable defendant, we nonetheless conclude that the range of considerations weighs in favor of this result on grounds of the strong public policy favoring enforcement of our licensing laws regarding the selling of alcoholic beverages. See *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc., supra* at 320-324. Compare *Fouquette* v. *Millette*, 310 Mass. 351, 353-354 (1941) (illegal registration of trucks as means to secure municipal work); *Tocci* v. *Lembo*, 325 Mass. 707, 710 (1950) (strong public policy against unauthorized building operations interfering with veterans' emergency housing program). Our decision is consistent with settled law in Massachusetts[19] and other jurisdictions.[20] The plaintiff may not recover under its illegal contract, and thus

---

[18]Were we to reach the issue, for the reasons discussed in part 4 of this opinion, we would conclude that the judge's conditional grant of the defendant's motion for a new trial was an abuse of discretion. See *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 127-130 (1992). Quite apart from his interpretation of the renewal provision, the judge's conclusion that there was no evidence to support the jury's verdict was unwarranted. This being so, the judge articulated no reasoned basis either for his decision to grant a remittitur, or for the amount of the remittitur granted. In these circumstances, but for our decision that the plaintiff's contract claim is barred by illegality, we would conclude that reinstatement of the jury verdict would be appropriate.

[19]See *Brigham* v. *Potter*, 14 Gray 522, 524 (1860) (partial consideration for notes securing mortgage consisted of liquor sold illegally; notes and mortgage held to be wholly void); *Holt* v. *O'Brien*, 15 Gray 311 (1860) (where sale of ale and intoxicating liquors was illegal, plaintiff could not recover under same contract for separate amounts charged for barrels and vessels); *Riley* v. *Jordan*, 122 Mass. 231, 233-234 (1877) (payments under

the judge properly allowed judgment notwithstanding the verdict.

6. *The c. 93A count.* There is no merit in the plaintiff's argument that the judge erred in failing to find that the defendant deliberately and unfairly repudiated the lease agreement on specious grounds, i.e., that it was superseded by the sham management agreement. Having elected to reserve all aspects of the c. 93A claim, the judge was not bound by the jury's answers to special questions on the common law

assigned lease, pursuant to which subtenants illegally sold intoxicating liquors, could be found to be gain from illegal business tainting lease and guaranty of performance under lease); *Kennedy* v. *Welch,* 196 Mass. at 594-596 (note and mortgage given as consideration for privilege of selling liquor under transferor's license held to be illegal and void; illegality also tainted second note given as consideration for release of first note); *Downey* v. *Charles S. Gove Co.,* 201 Mass. 251, 252 (1909) (notes and mortgages given in payment for liquor illegally sold were illegal and unenforceable); *Bondy* v. *Hardina,* 216 Mass. 44, 47 (1913) (New York liquor dealer, unlicensed in Massachusetts, could not recover price of liquor unlawfully sold in Massachusetts); *Boylston Bottling Co.* v. *O'Neill,* 231 Mass. 498, 501 (1919) (contract to deliver beer sold partly in town where such sale was unlawful rendered entire contract void); *James J. Sullivan, Inc.* v. *Cann's Cabins, Inc.,* 309 Mass. 519, 520-521 (1941) (agreement creating obligation of licensee to pay money to wholesaler was extension and receipt of credit in violation of statute).

[20]See *Klukavy* v. *United Natl. Ins. Co.,* 717 F. Supp 480, 482, 485-488 (E.D. Mich. 1989); *Clark* v. *Tinnin,* 81 Ariz. 259, 263 (1956); *Kalastro* v. *Duncan,* 90 Ariz. 122, 125 (1961); *Hooper* v. *Barranti,* 81 Cal. App. 2d 570, 574-578 (1947); *Connecticut Importing Co.* v. *Janowitz,* 128 Conn. 433, 436-437 (1941); *Smith* v. *Nix,* 206 Ga. 403, 407-408 (1950); *Atlanta* v. *Henry Grady Hotel Corp.,* 220 Ga. 249, 256-258 (1964); *Auto City Brewing Co.* v. *Gruich,* 301 Mich. 320, 326-331 (1942); *Minter Bros.* v. *Hochman,* 231 Minn. 156, 159-163 (1950); *DeMayo* v. *Lyons,* 358 Mo. 646, 650-651, 654 (1948); *Krueger* v. *Hatton,* 75 N.D. 489, 494 (1947); *Nahas* v. *George,* 156 Ohio St. 52, 56-59 (1951); *Tucker* v. *Binenstock,* 310 Pa. 254, 262-264 (1933); *Pendarvis* v. *Berry,* 214 S.C. 363, 368-370 (1949); *Beverage Co.* v. *Villa Marie Co.,* 69 S.D. 627, 629-632 (1944); *Sponholz* v. *Meyer,* 270 Wis. 288, 291-294 (1955); *Frederics* v. *Bressler,* 31 Colo. App. 117, 118-120 (1972); *Bernstein* v. *Peters,* 68 Ga. App. 218, 223-224 (1942); *Maywood-Proviso State Bank* v. *Oakbrook Terrace,* 67 Ill. App. 2d 280, 290-291 (1966); *Marks* v. *Conrad Seipp Brewing Co.,* 74 Ind. App. 50, 54-56 (1920); *Leshem* v. *Leshem,* 31 Del. Ch. 37, 41 (1949). See also *Thacher Hotel, Inc.* v. *Economos,* 160 Me. 22, 25 (1964); *Marquette Sav. & Loan Assn.* v. *Twin Lakes,* 38 Wis. 2d 310, 315 (1967). But see *Denning* v. *Taber,* 70 Cal. App. 2d 253, 260 (1945); *Greene* v. *Brooks,* 235 Cal. App. 2d 161, 168 (1965); *Johnstone* v. *Svejovsky,* 170 Mont. 504, 507 (1976); *Umani* v. *Reber,* 191 Pa. Super. 185, 193 (1959).

contract claim. *Poly* v. *Moylan*, 423 Mass. 141, 151 (1996). *Ravosa* v. *Zais*, 40 Mass. App. Ct. 47, 54 (1996). Contrary to the defendant's groundless contention that the management agreement was controlling, on which point the judge agreed with the jury, the judge found that the defendant nonetheless continued to negotiate the issue of reimbursement under the lease agreement until the plaintiff challenged the defendant's operation of its license by letter to the ABCC. The judge also found that there was no "enhanced value" entitling the plaintiff to reimbursement in any event. These findings are supported by evidence which the judge properly could have credited and are not clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). See *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. at 130-131. Notwithstanding the jury's contrary conclusion, we cannot rightly say that the judge erred in finding that the defendant did not repudiate the renewal provision contained in the lease agreement, or in ruling that the plaintiff failed to establish its claim under c. 93A. The plaintiff does not argue that other findings by the judge on the c. 93A count were error, and thus we deem the issues waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

The judgment notwithstanding the verdict on count II of the complaint is affirmed. The judgment for the defendant on count VIII of the complaint is affirmed. The defendant's appeal is dismissed.

*So ordered.*