Fremont-Smith, J.
INTRODUCTION
This case is before the Court on plaintiffs, New Boston Garden Corporation (“NGBC”), motion for summary judgment pursuant to Mass.R.Civ.P. 56, against the defendant, Gary K. Baker. For the following reasons, the plaintiffs motion is ALLOWED in part and DENIED in part.
BACKGROUND
The summary judgment record, when viewed in the light most favorable to the defendant, indicates that NGBC is the operator of the FleetCenter, home to the Boston Bruins and Boston Celtics, and is the lessor of the FleetCenter to the Bruins and Celtics. However, NGBC, the Celtics and the Bruins are all separate entities. Pursuant to license/lease agreements with *596 both teams, NGBC is authorized to issue and sell tickets to premium club seating within the FleetCenter. Of the price charged for such seats, NGBC is granted the exclusive right to any rental or license fee charged to the patron, but is required to remit the “imputed ticket price” to the respective teams.[1] If a seat remains unsold or unlicensed, NGBC loses the licensing fee while the Celtics or Bruins absorb the lost ticket price. Tickets sold by NGBC do not identify NGBC as issuer, but display the logos of the respective teams. Season tickets are also sold through box offices operated by NGBC and the Bruins and a ticketing operation of the Celtics.
Pursuant to General Laws c. 140, §185A[2] (the “anti-scalping statute”) persons engaged in the resale of tickets to public amusements must first obtain a license from the Commonwealth. NGBC does not possess such a license.
On April 7, 1995, Baker and George Zografos, who is not a parfy to this case, entered into a three-year license agreement with NGBC for the use of two premium club seats at the FleetCenter. Baker and Zografos paid a $5,000 security deposit and the annual fee for the 1995-96 season. NGBC thereafter furnished the tickets to Baker and Zografos.
OnMay31,1996, NGBC sent to Baker and Zografos an invoice for the annual fee for the second year of the agreement, covering the 1996-97 season, due on July 1, 1996. On June 6, 1996, NGBC sent to Baker an upgrade form with an attached price breakdown sheet showing the 1996-97 annual fees for each seating section. Baker signed the upgrade request form and returned it to NGBC.
On June 7, 1996, Baker sent to NGBC a letter confirming his upgrade request and seeking a transfer of the agreement from himself and Zografos to himself and Elliot Sherman,[3] as Zografos no longer wanted the tickets.
In response to Baker’s letter, NGBC prepared a new agreement (“Agreement”), dated June 11, 1996, naming Baker and Sherman as licensees. On or about June 12, 1996, Baker and Sherman signed the Agreement. In his deposition, Baker testified that he understood he entered into a contract creating binding obligtions upon himself and NGBC.
The Agreement provided that in each of the two remaining license years, 1996-97 and 1997-98, the defendant and Sherman would pay an annual fee, comprised of the license fee charged by NGBC and the base club seat ticket fee, also known as the imputed ticket price, set by either the Bruins or the Celtics. See Agreement at §§3.01(a)-(c). The Executive Summary of the Agreement, an attached page preceding the Agreement, stated that the term of the Agreement is three years, with the annual fee invoiced on a yearly basis. In his deposition, Baker stated that he understood there was a “three year component” to the Agreement, and that NGBC would only deliver his tickets after receipt of the annual fee payment. §15.13 provides that the oligation to pay the annual fees is joint and several.
NGBC sent Baker an invoice for the 1996-97 annual fee, which was the same price indicated in the Agreement and was $1 less than the price listed on the price breakdown attached to the upgrade form. After Baker failed to remit payment, NGBC sent several reminder notices. On February 4, 1997, pursuant to §11.03 of the Agreement, NGBC accelerated the full amount due under the Agreement. Baker never paid the annual fees for the 1996-97 or 1997-98 seasons.
NGBC contends it has suffered damages totalling $39,356, after mitigation, as a result of Baker’s breach of the Agreement.[4] NGBC further contends that it is entitled to recoup costs and legal fees associated with enforcing its rights under the Agreement, pursuant to §11.03 of the Agreement. §15.08 of the Agreement provides that in proceedings to interpret, enforce or terminate the Agreement, the prevailing party may recover attorneys fees and costs.
NGBC asserts that it made diligent efforts to relicense Baker’s seats or otherwise mitigate its damages, but was only able to sell Baker’s tickets for several games, resulting in $510 in mitigation. Baker disputes NGBC’s claim that it made reasonable efforts to mitigate, pointing to NGBC’s refusal to lower the ticket price for non-sold out games.
For the following reasons, NGBC’s motion for summary judgment is ALLOWED on the issues of whether the Agreement constituted a binding, enforceable contract, the term of the Agreement, and whether Baker breached the Agreement. However, Baker has raised a question of material fact as to the adequacy of NGBC’s efforts to mitigate its damages, so that the NGBC’s motion for summary judgment on the issue of damages is DENIED.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Massachusetts Bay Transp. Auth. v. Allianz Ins. Corp., 413 Mass. 473, 476 (1992). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id.; HRPT v. MacDonald, 43 Mass.App.Ct. 613, 621 (1997). Here, Baker cannot defeat the summary judgment motion by resting on his pleadings and mere assertions of disputed facts to defeat NGBC’s motion. Lalonde v. Eissner, 405 Mass. 207, 209 (1989).
*597 In deciding a motion for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The Court should not weigh evidence, assess credibility or find facts. See Kelley v. Rossi, 395 Mass. 659, 663 (1985). The Court may only consider undisputed material facts and apply the law to them. See id. Summary judgment is appropriate when the issue presented is one of contract interpretation, because this issue raises only a question of law. Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982); Massachusetts Bay Transp. Auth., supra at 476. Similarly, the application of contract language to known facts also presents a question of law. Kelleher v. American Mutual Life Ins. Co. of Boston, 32 Mass.App.Ct. 501, 503 (1992).
I. Breach of the Agreement
To establish a claim for breach of contract, NGBC must show (1) an agreement was made between NGBC and Baker which was supported by valuable consideration; (2) NGBC has been ready, willing and able to perform; (3) Baker’s breach prevented NGBC from performing; and (4) NGBC was damaged as a result. See Singarella v. Boston, 342 Mass. 385, 387 (1961). As Baker has offered no admissible evidence, pursuant to Mass.R.Civ.P. 56(c), raising a genuine issue of material fact with respect to these elements, NGBC is entitled to summary judgment.
The Agreement was, beyond dispute, a valid contract supported by valuable consideration. See Lucey v. Hero Int’l Corp., 361 Mass. 569, 574 (1972) (nature and extent of parties’ obligations and rights may be ascertained from definite essential terms ofageement). Baker promised to buy, and NGBC promised to sell, season premium club seats.[5] The defendant admitted in a deposition his understanding that upon signing the Agreement, he thereby entered into a contract with binding obligations.
Baker argues that NGBC cannot establish the second element because, without having a license under G.L.c. 140, §185A, NGBC could not legally sell tickets and was thus not legally able to perform. See Buccella v. Schuster, 340 Mass. 323, 326 (1960) (court may deny enforcement of contract where violation of statute impacts public policy); Hastings Assoc., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass.App.Ct. 162, 177 (1997) (same). However, Baker has pointed to no affidavit or deposition testimony or other admissible evidence that calls into question NGBC’s status as an issuer, as opposed to a reseller, of tickets.
To become subject to the statute, a person must have previously acquired from another a legal or equitable right to the ticket, which is then transferred for a consideration. See 7 Op. Att’y Gen. 564, 566 (1924). The undisputed facts indicate that NGBC does not acquire any ownership interest in the tickets from the Bruins or the Celtics, but only acts jointly with each of the Bruins and Celtics pursuant to the license/lease agreements to transfer the ownership rights in the tickets to the patrons. See id. That NGBC does not “resell” the tickets is indicated by the fact that under the license/lease agreements •with the Bruins and Celtics, NGBC has the exclusive right only to the licensing fee charged the patron, and, after sale to the patron, NGBC must remit the “imputed ticket price”[6] to each team. Moreover, if no ticket is sold, the Bruins or Celtics bear the loss of the “imputed ticket price.” The facts that NGBC and the Bruins each operate a box office, that the Celtics also maintain another ticketing operation, and that Red Auerbach’s printed signature appears on the back of the Celtics tickets issued to Baker, do not alter the conclusion that NGBC functions, under the arrangement, as a joint issuer, rather than as a purchaser of the tickets.
Furthermore, it is undisputed that NGBC was ready, willing and able to perform. In the first year of the Agreement, NGBC dutifully delivered the tickets after the defendant paid the annual fee, and stood ready to do so in the subsequent year.
With respect to the third element of the plaintiffs claim, Baker’s failure to pay the annual fees undisputably constituted a breach of the Agreement. Baker testified in his deposition that he understood he would only receive tickets after he paid the annual fee. As Baker’s payment of the annual fee clearly was a condition precedent[7] to NGBC’s duty to transfer the tickets, the defendant’s failure to remit payment excused NGBC’s refusal to deliver the tickets. See Hastings Assoc., Inc., supra at 177.
Baker further argues that mitigation of damages is relevant not only to the issue of damages, but that NGBC’s failure to mitigate constituted a material breach of the Agreement, which excused Baker’s performance. Because the Agreement expressly obligated NGBC to undertake reasonable efforts to mitigate, the defendant says, its failure to mitigate constitutes the breach of a condition precedent, which excuses defendant’s performance. Such a construction of the Agreement, however, would lead to the unfair result that NGBC’s failure to totally mitigate its damages would excuse defendants from paying anything as a result of their breach of contract — a situation that could not reasonably have been in the contemplation of the parties when they entered into the Agreement. Nor has any case so construing similar language in a contract been called to the Court’s attention.
That the provision in the Agreement obligating NGBC to mitigate damages was not intended to operate as a condition precedent, is further indicated by the fact that the provision appears under the heading “Remedies,” and that this same section of the Agreement (§11.03) further provides:
No remedy of the Owner shall be considered exclusive of any other remedy, but the same shall be cumulative and shall be in addition to every other *598 remedy given hereunder, or now or hereafter existing at law or in equity including, without limitation, the right to maintain an action to recover all amounts due hereunder. The Owner may exercise its rights and remedies at any time, in any order, to any extent and as often as the Owner deems advisable.
This language plainly indicates that the mitigation provision was intended only to be an additional “cumulative” remedy, which was to be in “addition to every other remedy,” including the “right to maintain an action to recover all amounts due,” and to be a “remedy,” which could be exercised “as the Owner deems advisable.”
Accordingly, the question of NGBC’s mitigation efforts is relevant only to the issue of damage assessment.
As to the issue of damages, an affidavit from NGBC’s vice president, James Bednarek, avers that NGBC was harmed by Baker’s breach. Baker does not point to any facts in the record disputing the assertion that NGBC suffered harm. The only demonstrated dispute is as to amount of NGBC’s damages, and as to whether NGBC made reasonable efforts to mitigate its damages.
II. Term of the Agreement
Interpretation of an unambiguous contract is a matter of law for the Court. See Lawrence-Lynch Corp. v. Dep’t. of Envtl. Management, 392 Mass. 681, 682 (1984). The defendant contends that the contract term is ambiguous, and that because the Agreement is an adhesion contract, the term should be construed to be one year, as this was the prior practice at the Boston Garden.
The defendant’s argument fails because the Executive Summary and the Agreement unambiguously state that the term of the Agreement is three years. Thus, evidence of prior business custom is irrelevant. See id. Invoicing the fee annually instead of requiring up-front, fuE payment for three seasons does not transform the appEcable term from three years to one year.
III. Mitigation of Damages
After Baker breached the Agreement, NGBC was required to take reasonable steps to place itself in as good a position as it would have been had Baker performed. See Gillentine v. McKeand, 426 F.2d 717, 724 n. 24 (1st Cir. 1970). The duly to mitigate its damages obligated NGBC to be willing to expend such sums as would reasonably be necessary to reduce the amount of its damages which would otherwise be incurred. See Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982), citing Warren v. Stoddart, 105 U.S. 224, 229 (1881).
At trial, Baker, as the party in breach, bears the burden of demonstrating that NGBC did not make reasonable efforts to mitigate its damages and that NGBC would have been able to mitigate its damages if it had undertaken such efforts. See American Mechanical Corp. v. Union Machine Co. of Lynn, Inc., 21 Mass.App.Ct. 97, 103 (1985). At this juncture, Baker must only raise a question of material fact to render summary judgment inappropriate. See Pederson, supra, at 17.
NGBC asserts that it satisfied its duty by maintaining a sales staff, advertising the premium club seats in the Boston Business Journal and on WEEI Sports Radio, by offering promotional gifts in exchange for attending sales presentations, and by soliciting leads from other patrons. NGBC did mitigate $510 of its loss by selling the tickets to several games.
The defendant has successfully raised a question of material fact as to whether NGBC undertook reasonable efforts to mitigate its damages. The affidavit of Maureen Buckley questions the adequacy of NGBC’s mitigation efforts, asserting that NGBC will not lower ticket prices for games not sold out, but would prefer to have empiy seats. Buckley’s testimony raises a question as to the adequacy of NGBC’s efforts.
ORDER
It is hereby ORDERED that the plaintiffs motion for summary judgment, pursuant to Mass.R.Civ.P. 56, is ALLOWED as to the issues of the existence, term and the defendant’s breach of the Agreement, so that judgment for the plaintiff on liability shall be entered. Damages are disputed, and a trial on assessment of damages shall be scheduled.

§2.04 of the lease agreement with the Bruins and §2.04 of the lease agreement with the Celtics provide, in relevant part, “any rental payment, fee or other charge for the use of, or access to, any Premium seating (which are designated as ‘Annual Fees’ in the Standard form) or the Clubs are the exclusive property of the Lessor, except that Lessee shall be entitled to receive the Imputed Ticket Price for Games for tickets actually issued by Lessor . .

G.L.c. 140, §185A provides, in pertinent part, “No person shall engage in the business of reselling any ticket or tickets of admission or other evidence of right of entry to any theatrical exhibition, public show or public amusement or exhibition .. . without being licensed therefor by the Commissioner of Public Safety . . . The sale of a ticket or pass entitling the holder thereof to admission to any such theatrical exhibition, public show or public amusement or exibition upon payment either of nothing or a sum less than that demanded of the public generally, shall be deemed to be a resale thereof within the meaning of this section.”

Sherman, Baker’s attorney, is also a named defendant in this action: however, NGBC is pursuing summary judgment only against Baker.

Both parties agree that the defendant is entitled to a retum/credit of his $5,000 security deposit.

The defendant is incorrect in contending that a promise is inadequate consideraiton. A promise may support another promise. See 2 S. Williston, Contracts §7:21, at 388-89 (4th ed. 1990).

“Imputed ticket price” is the “base club seat ticket fee.” See p. 4, supra

A condition precedent is an event which must occur before an obligation to perform arises under the contract. See Mass. Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45, 47 n.4 (1991).