ATLANTIC RESEARCH MARKETING SYSTEMS, INC., a/k/a A.R.M.S., and Richard E. Swan, Plaintiffs,

v.

SACO DEFENSE, INC., Defendants.

C.A. No. 95–10105–RCL.

United States District Court, D. Massachusetts.

March 2, 1998.

Douglass A. Hale, Wynn & Wynn, Raynham, MA, John P. McGonagle, Boston, MA, Francis A. Mooney, McLaughlin, Mooney & Associates, Welesley, MA, for Plaintiff.

Doron F. Ezickson, Cherie L. Krigsman, Peter L. Resnik, McDermott, Will & Emory, Boston, MA, for Defendants.

### *ORDER*

LINDSAY, District Judge.

Report and Recommendation Accepted.

**REPORT AND RECOMMENDATION RE-
GARDING (1) DEFENDANT'S MO-
TION FOR SUMMARY JUDGMENT
(DOCKET NO. 48) AND (2) PLAIN-
TIFFS' CROSS–MOTION FOR SUM-
MARY JUDGMENT AS TO LIABILI-
TY (DOCKET NO. 55); AND ORDER
REGARDING DEFENDANT'S MO-
TION TO STRIKE PLAINTIFFS' OP-
POSITION TO DEFENDANT'S SUM-
MARY JUDGMENT MOTION AND
PLAINTIFFS' CROSS–MOTION FOR
SUMMARY JUDGMENT (DOCKET
NO. 60)**

KAROL, United States Magistrate Judge.

Oct. 23, 1997.

Plaintiffs, Atlantic Research Marketing Systems, Inc., a/k/a A.R.M.S. ("ARMS") and its principal, Richard E. Swan ("Swan") (collectively, "Plaintiffs"), filed a two-count Verified Complaint against defendant, Saco Defense, Inc. ("SDI"), for breach of a Limited License Agreement dated January 5, 1993 (Count I) and of a Consulting Agreement dated July 1, 1992 (Count II). Discovery has been completed, and three motions are now before the court: (1) Defendant's Motion for Summary Judgment (Docket No. 48), (2) Plaintiffs' Cross–Motion for Summary Judgment as to Liability (Docket No. 55), and (3) Defendant's Motion to Strike Plaintiffs' Opposition to Defendant's Summary Judgment Motion and Plaintiffs' Cross–Motion for Summary Judgment (Docket No. 60). For the reasons stated below, I recommend that Defendant's Motion for Summary Judgment be **ALLOWED** as to Count I of Plaintiffs' Verified Complaint and **DENIED** as to Count II; I recommend that Plaintiffs' Cross–Motion for Summary Judgment as to liability be **DENIED;** and I order that defendant's Motion to Strike be **ALLOWED** in part and **DENIED** in part, as discussed more thoroughly below.

1. Except as otherwise noted, the facts are either undisputed or set forth in the light most favorable to the party opposing summary judgment.

2. It did, however, require ARMS to buy from SDI certain minimum quantities of smaller, relatively inexpensive component parts of the Prod-

## I. FACTS AND PRIOR PROCEEDINGS[1]

### A. The Contracts

ARMS is a small company in the business of designing and selling, among other items, proprietary mounting devices and associated products that are used to attach scopes and other fire control devices to rifles and other weapons. SDI is a much larger company than ARMS and is in the business, among other things, of manufacturing automatic weapons primarily for sale to the U.S. military. In January 1993, ARMS and SDI entered into a "Limited License Agreement" ("LLA"). Under the LLA, SDI paid ARMS a license fee of $35,000 in exchange for which ARMS gave SDI, for an initial term of eighteen months, the "sole and exclusive right and license to manufacture" for ARMS five proprietary mounting devices (the "Product") identified by ARMS product code and description as follows:

#18   M21/14 Mount
#19   Weaver/STANAG Mount
#20   AN/PVS–4 Mount
#21   STANAG Rings (set)
#37   Ring Inserts (set)

(Limited License Agreement ¶¶ 1.1, 2.1, 3.1, Ex. B, Index of Exhibits, Docket No. 76.) The LLA did not specify the prices that ARMS would have to pay SDI for Product, if any, that it purchased from SDI. Nor did it discuss other customary terms of sale, such as delivery dates or express product warranties. Indeed, the LLA did not even expressly provide that SDI had an obligation to accept orders from or sell Product to ARMS, and it did not expressly require ARMS to purchase Product from SDI.[2] Presumably, however, the parties contemplated that some such sales would take place and that SDI would recoup its investment in the license fee, at least in part, through such sales.

The LLA also provided that SDI could sell Product directly to end users, but only if it obtained ARMS' authorization to do so on a

uct, apparently as a means of enabling SDI to recoup the cost of the injection molds that, under the LLA, SDI was required to procure at its own expense. (Limited License Agreement ¶ 3.4, Ex. B, Index of Exhibits, Docket No. 76.)

case by case basis. The LLA itself, in Paragraph 2.4, conferred such authorization in the case of direct sales by SDI of certain Product to Israel, and it further provided that ARMS would refund SDI's $35,000 license fee if neither Israel nor ARMS ordered a specified minimum quantity of such Product from SDI. SDI agreed to pay a royalty for each unit of Product that SDI sold directly to an end user pursuant to authorization given by ARMS. The amount of the royalty, unlike the prices for Product purchased outright by ARMS from SDI, was specified in the LLA.

The LLA was not the first agreement between Plaintiffs and SDI. In July 1992, the parties had entered into a Consulting Agreement (the "CA"), pursuant to which ARMS was to provide consulting services to SDI for a term of three years. For such services SDI agreed to pay ARMS $100,000 in two installments, plus a monthly fee of $5,000 for 36 months, for a total payment of $280,000. (Consulting Agreement ¶ 4, Ex. K, Index of Exhibits, Docket No. 76 .) SDI had the right to terminate the CA "upon ninety (90) days prior written notice," but, if it did so, it was required to pay ARMS "the remaining full balance of monthly payments due under this contract." (*Id.* ¶ 5.) It is undisputed that SDI made the required payment of $100,000, plus eight monthly payments of $5,000 each, for a total payment of $140,000, and that it made its last monthly payment in February 1993. The circumstances under which the payments were discontinued are, however, very much disputed, with each side blaming the other for the breakdown of the consulting relationship and seeking damages for the other's alleged breach of the CA.

### B. *Prior Proceedings*

Plaintiffs filed a two-count Verified Complaint against SDI in January 1995, alleging, in respective counts, breach of the LLA and breach of the CA. With respect to the LLA, Plaintiffs alleged that SDI failed to make timely delivery of Product, arbitrarily extended delivery dates, canceled purchase orders without good cause, and delivered defective Product. With respect to the CA, Plaintiffs alleged that SDI failed to make timely payments of consulting fees and

thereby committed a material breach or caused the premature termination of the CA. In April 1995, SDI filed an answer and an eleven-count counterclaim, which included claims for breach by ARMS of the LLA and the CA. In due course, SDI served a set of interrogatories which required Plaintiffs, among other things, to state with particularity the bases for their damage claims, "including the amounts of each element of such damages, the act or omission of SDI that ... caused each element of damage, the theory on which said damages are sought, [and] the identity of all persons having any knowledge or information regarding the damages that plaintiffs have allegedly suffered as a result of SDI's actions or omissions...." (Plaintiffs and Defendants–In–Counterclaim Responses to Saco Defense, Inc.'s First Set of Interrogatories at 3, Ex. F, Index of Exhibits, Docket No. 76.) Other interrogatories asked Plaintiffs to particularize their claims that SDI delayed deliveries, canceled orders, and shipped defective products. Plaintiffs filed responses; SDI deemed the responses to be inadequate and filed a motion to compel further responses. (Docket No. 21).

I held a lengthy hearing on SDI's motion on April 29, 1996. At the hearing, I specified numerous respects in which Plaintiffs' responses were deficient, including their failure either to set forth facts upon which Plaintiffs intended to rely to prove that an act or omission by SDI caused damage to ARMS or to associate a particular loss with any discrete breach, such as a late delivery, a canceled order, or a shipment of defective Product. I ordered that proper responses be filed within thirty days and alerted Plaintiffs to the precariousness of their position if they did not take their discovery obligations seriously. In particular, I explicitly and repeatedly warned Plaintiffs on the record that they would be held to their supplemental responses and that, if those supplemental responses were insufficient as a matter of law to support a claim for damages, plaintiffs would be vulnerable to a dispositive motion filed by SDI. For example, I stated:

> If they [i.e., Plaintiffs] don't provide the information in the interrogatory response, I want to make this really clear on the record again, as far as I'm concerned, if

and when I ever see a dispositive motion, they will not be permitted to supplement their response in the form of affidavits in opposition to summary judgment. They will be held to this response as reflecting all the information they have on lost profits and lost sales, and they'll be required then to rely on the argument what they've provided is enough as a matter of law to establish their claim. If it's not enough as a matter of law to establish a claim, defendant will win. . . .

(Tr. of 4/29/96 Hearing at 36; *see also id.* at 22–23 ("If [SDI] file[s] a dispositive motion, and I want to underscore this, if [SDI] file[s] a dispositive motion saying this is all they (i.e., Plaintiffs) have said, it will not be acceptable for [Plaintiffs] to come back and say, well, here's more or here's something different . . . it will be too late to do that"); *id.* at 48 ("The same ground rules will apply here as I said earlier. Whatever you [Plaintiffs] say is the sum and substance of the information you'll be held to, and we'll test it for legal sufficiency sometime down the road")).

Toward the end of May 1996, Plaintiffs timely filed what they characterized as "supplemental responses" to SDI's damages interrogatories. (Plaintiffs' and Defendants-In-Counterclaim Supplemental Responses to Saco Defense, Inc.'s First Set of Interrogatories, Ex. F, Index of Exhibits, Docket No. 76.) Despite the fact that as recently as 1992, its most profitable year prior to entering into the LLA, ARMS had profits of only $68,000 on sales of goods and services of approximately $250,000, the supplemental responses set forth a claim for lost profits in an amount in excess of $63,000,000 based on anticipated sales by ARMS of $106,000,000 of Product. Of that $63,000,000 in lost profits, nearly $23,000,000 was said to have been lost on anticipated sales of $38,000,000 during just the first two years of the LLA, 1993 and 1994. The supplemental responses included no other claim for damages, such as for the cost of cover, incidental expenses, loss of reputation or injury to goodwill, attorneys' fees, or nominal damages. Nor did Plaintiffs break down their aggregate claim for $63,-000,000 in lost profits into discrete components attributable to specific breaches or categories of breaches by SDI.

In July 1996, SDI filed a motion to strike the supplemental responses. In its accompanying memorandum, SDI made two primary arguments in support of its motion. First, SDI argued that Plaintiffs should have filed completely new responses to the interrogatories that had been stricken, rather than supplemental responses which had to be read in conjunction with the original responses in order to make sense. This was a minor technical problem, however, relative to SDI's second objection—that the supplemental responses, even when read in conjunction with the original responses, still failed to provide legally sufficient support for Plaintiffs' damage claim.

On August 9, 1996, apparently in an attempt to respond to SDI's technical objection to the supplemental responses, Plaintiffs purported to file what they called "consolidated supplemental" responses to interrogatories, by which label they presumably meant that the original responses and the supplemental responses they had filed on May 31, 1996 had now been combined into a single set of consolidated responses. Once again, there were two problems with the "consolidated supplemental" responses. First, the deadline for filing supplemental responses had long since passed, and Plaintiffs had not sought an extension of time to make this late filing. Second, and of greater concern from a substantive standpoint, the "consolidated supplemental" responses included some new information that Plaintiffs had never presented before in any form. (*See* Plaintiffs' Consolidated Supplemental Response to Defendant's Interrogatories Numbered 1, 5, 6, 7, 8, 9 and 16, Ex. F, Index of Exhibits, Docket No. 76.) This second problem in particular violated both the letter and the spirit of the order I had entered on April 29, 1996, which required that supplementation be completed by May 31, 1996, so that the parties could complete remaining discovery by the June 30, 1996 cutoff and file dispositive motions shortly thereafter.

I addressed SDI's motion in a memorandum and order dated August 21, 1996. I

ruled, first, that Plaintiffs could not further supplement their responses after May 31, 1996 without leave of court. (Memorandum and Order Regarding Defendant's Motion to Strike Plaintiff's Damage Claims (Karol, U.S.M.J.), dated 8/21/96, at 2, Docket No. 47.) [3] I further ruled, however, that the supplemental responses that Plaintiffs had timely filed on May 31, 1996 would not be stricken, because, whatever their shortcomings might be as a matter of substantive law, there was no evidence that Plaintiffs had failed to include in those supplemental responses all the relevant information that was available to them regarding fact of injury, amount of injury, and causation. I went on to state, however, that, consistent with what I had said at the April 29, 1996 hearing, I would hold Plaintiffs to those supplemental responses if SDI later challenged them at trial or in a dispositive motion as being legally insufficient to support a damage claim. (*Id.*) Finally, I ruled that, because Plaintiffs had still not described with particularity any instance in which SDI had purportedly canceled an order, been late filling an order, or shipped defective Product and had still not purported to tie any specific loss to any such instance, Plaintiffs would not be permitted to attempt to prove any such specific instance or to recover any discrete loss attributable to any such specific instance. Rather, they would only be permitted to attempt to prove damages based on the aggregate loss theory set forth in the supplemental responses.[4] By margin order dated September 25, 1996, (Docket No. 52), Judge Lindsay denied Plaintiffs' motion for reconsideration of my August 21 order.

In the midst of all this skirmishing regarding the sufficiency of Plaintiffs' responses to interrogatories, I held a case management conference on July 1, 1996. At the conference, Plaintiffs stated that they intended to file a motion to amend their complaint. They were given until July 15 to do so. To accommodate the filing of this motion, and with the agreement of the parties, a new cutoff date of September 6, 1996 was established for the filing of dispositive motions. (Case Management Order (Karol, U.S.M.J.), dated 7/1/96, Docket No. 34.) Plaintiffs filed a timely motion to amend their complaint to include a claim, among others, that SDI violated the Limited License Agreement by failing to manufacture Product for the Government of Israel (the "Israeli Order"). (Memorandum in Support of Plaintiffs' Motion to Amend and Supplement Complaint at 4, 5, Docket No. 40.) I denied that motion by margin order dated August 21, 1996. (*See* Plaintiffs' Motion to Amend Complaint, Docket No. 39.) This decision was affirmed by Judge Lindsay on September 25, 1996 (Docket No. 52). Consequently, there is no claim in this case for royalties ARMS purportedly lost on the Israeli Order that SDI allegedly failed to fill.

This sets the stage for the three motions that are presently before the court. On August 21, 1996, or approximately two weeks before the deadline for filing dispositive motions, SDI filed a motion for summary judg-

---

**3.** I note, however, that even if I were to take into account the new information contained in the "consolidated supplemental" responses that Plaintiffs attempted to file on August 9, 1996, my recommendation and decision herein would be unchanged.

**4.** In this respect, my ruling should have come as no surprise or disappointment to Plaintiffs, since it was entirely consistent with the way in which Plaintiffs had themselves articulated their damages theory in their opposition to SDI's motion. (Plaintiff's Opposition to Motion to Strike Damage Claim at 12, Docket No. 43.) Plaintiffs there stated their theory as follows:

As in the case of the extensions of delivery dates referenced in ARMS' answer to interrogatory no. 5, the cancellation of ARMS purchase orders (addressed in interrogatory no. 6) and the delivery of defective products (addressed in interrogatory no. 7) [sic] *are not asserted by ARMS as independent claims resulting in separately identifiable damages.* They are part of the overall nonperformance of SDI which resulted in the damages detailed extensively in ARMS' supplemental response to interrogatory no. 1.... To the extent there is any doubt as to ARMS' position in that regard, the consolidated supplemental response to SDI's interrogatories ... will expressly include with respect to each of the interrogatories in question, a statement to the effect that *ARMS does not contend that the various actions or inactions of SDI give rise to separable, individual damages claims, but rather that they contributed to the overall loss of profit which ARMS has detailed in its consolidated supplemental response to interrogatory no. 1.*

(*Id.* (emphasis added).)

ment based exclusively on the proposition that "plaintiffs have failed to raise a genuine issue of material fact regarding their damage claims." (Defendant's Motion for Summary Judgment at 1, Docket No. 48.) Plaintiffs sought and were granted an extension of time to file their opposition, which they timely filed on September 24 (Docket No. 55). They also purported to include in their opposition, however, a "cross-motion for summary judgment as to liability" on both counts of their Verified Complaint, notwithstanding that they had not sought or obtained an extension of the September 6, 1996 deadline for the filing of dispositive motions. In October 1996, SDI filed its opposition to Plaintiffs' cross-motion for summary judgment. (Defendant's Opposition to Plaintiffs' Cross–Motion for Summary Judgment and Reply in Support of Defendant's Motion for Summary Judgment ("Def.'s Opp. to Pls.' Cross–Motion"), Docket No. 77.) SDI also filed a separate motion to strike both Plaintiffs' opposition to SDI's motion for summary judgment (on the ground that Plaintiffs' opposition was based in part on information that had not been disclosed in Plaintiffs' supplemental responses to interrogatories) and Plaintiffs' cross-motion for summary judgment (on the ground that the cross-motion had not been timely filed). (Docket No. 60). The cross-motions for summary judgment and the motion to strike are the three motions that are presently before the court.

## II. *ANALYSIS*

### A. *SDI's Motion to Strike*

(a) *Plaintiffs' Opposition to SDI's Motion for Summary Judgment*

SDI seeks to strike Plaintiffs' opposition to SDI's motion for summary judgment on the ground that the opposition is based in part on information which Plaintiffs were prohibited by prior orders from relying upon. Specifically, SDI complains about Plaintiffs' attempt to rely on a certain business plan (the "Business Plan") and, to a lesser extent, on

evidence regarding SDI's failure to consummate any sales of Product as a part of the Israeli Order. I will consider each in turn.

The Business Plan, which is included in SDI's Index of Exhibits, (Docket No. 76), as Exhibit H, is actually entitled "ARMS Presentation March 25, 1992." It is a projection prepared by an SDI manager of the size of the potential market for ARMS products worldwide, including the U.S. military market, the foreign military market, and the worldwide commercial market (*e.g.*, police, hunters, and other gun enthusiasts). It is apparent from the text of the Business Plan that it was prepared based on the assumption that SDI would acquire from ARMS the unrestricted right to manufacture Product and sell it directly to end users, using its own substantial sales and marketing organization and an expanded network of distributors.[5] The March 1992 Business Plan appears to be a final version of a February 1992 draft document entitled "Marketing Plan Fire Control System (FCS) Hardware" (the "Marketing Plan"), prepared by the same SDI manager based on the same assumption that SDI would acquire worldwide rights to sell ARMS products through its network of distributors directly to end users. The Marketing Plan is included in SDI's Index of Exhibits, (Docket No. 76), as Exhibit G.

SDI's objection derives from the fact that, in both their supplemental and consolidated supplemental responses to interrogatories, Plaintiffs never mentioned the Business Plan, despite the fact that it had been in their possession at all relevant times. Instead, they relied entirely on the sales and revenue figures appearing in the Marketing Plan as the basis for their lost profits claim. Plaintiffs' reliance on the Marketing Plan had prompted SDI to argue in its summary judgment papers that the Marketing Plan could not reasonably be relied upon because, *inter alia*, it was just a draft document. To counter this argument, Plaintiffs argued in their opposition to summary judgment that the

---

5. As noted, the final arrangement between the parties, as embodied in the LLA, took a very different form. Under the LLA, SDI could manufacture Product for purchase by ARMS for resale by ARMS to end users, but it needed specific authorization from ARMS to sell directly to end users itself. Thus, under the actual arrangement between the parties, ARMS retained ultimate control over and responsibility for the sale of Product to end users.

draft Marketing Plan evolved into the Business Plan, and the Business Plan was certainly in sufficiently final form to be relied upon even if the Marketing Plan was not. Because Plaintiffs had not previously purported to refer to or rely upon the Business Plan, SDI moved to strike Plaintiffs' opposition.

The dispute about Plaintiffs' right to rely upon the Business Plan is at most a tempest in a teapot. My recommendation below that SDI's motion for summary judgment be allowed as to Count I of the Verified Complaint does not turn at all on the question of whether the document on which Plaintiffs place primary reliance for their sales and revenue projections is merely a draft, rather than a final version, of a sales projection. It is based on the far more significant problem that Plaintiffs' claim for lost profits, whichever document Plaintiffs rely upon, is hopelessly speculative, based on demonstrably false assumptions, and devoid of proof of causation. For this reason, and because, in any event, I would not strike an entire opposition just because it referred to a document that Plaintiffs had not specifically referenced in their responses to interrogatories, SDI's motion is **DENIED,** to the extent it is based upon Plaintiffs' reference to the Business Plan.

SDI also bases its motion to strike Plaintiffs' opposition on the fact that the opposition at one point refers to the "Israeli Order," notwithstanding that Plaintiffs' motion for leave to amend its complaint to include a claim based on SDI's failure to fill such order was previously denied. I fully agree that the Israeli Order is not in this case, not just because the motion to amend was denied, but also because I previously ruled that Plaintiffs would be held to their aggregate loss theory, of which sales to Israel is but one discrete component.[6] Nevertheless, an isolated reference to a claim that is not in the case is not a basis for striking an entire opposition to a motion for summary judgment. For this reason, and because there are no other substantial bases for striking the opposition, SDI's motion is **DENIED,** to the extent it seeks to strike Plaintiffs' opposition to SDI's motion for summary judgment.

(b) *Plaintiffs' Cross–Motion for Summary Judgment*

To the extent SDI's motion seeks to strike Plaintiffs' cross-motion for summary judgment, it is on an altogether different footing. At a case management conference on July 1, 1996, primarily to accommodate Plaintiffs' desire to file a motion to amend their complaint, I extended until September 6, 1996 the deadline for filing dispositive motions. Plaintiffs did not object to the establishment of a cutoff date in general or to this new date in particular, and the date was confirmed in a Case Management Order issued that same day. (Docket No. 34.) Yet, without seeking an extension of the cutoff date or leave to file late, Plaintiffs attempted to file their cross-motion on September 24, 1996, or 18 days after the deadline. For this reason, Plaintiffs' cross-motion is untimely and SDI's motion will be **ALLOWED,** to the extent it asks that the cross-motion be stricken. As discussed further below, however, even if I were to consider the cross-motion, I would recommend that it be denied.

**B. *Motions for Summary Judgment***

(a) *SDI's Motion*

SDI seeks summary judgment on both counts of Plaintiffs' Verified Complaint. Each count will be considered in turn.

With respect to Count I, SDI's attack is aimed exclusively at Plaintiffs' damage theo-

6. There is a further problem with Plaintiffs' attempt to reintroduce the Israeli Order into the case. As discussed below, Plaintiffs' entire damage claim is based on a methodology that assumes that end users would be buying Product from ARMS and that ARMS' loss was comprised of "profit," *i.e.,* the difference between cost and selling price. In actuality, however, any loss that ARMS would have sustained based on SDI's failure to fill the Israeli Order would have been in the form of lost royalties, since the LLA confers on SDI the right to make direct sales to the Government of Israel. Since Plaintiffs' damage claim, as·set forth in its supplemental interrogatory responses, deals exclusively with lost profits and does not even purport to deal with lost royalties, there is no basis whatsoever for any recovery of damages with respect to the Israeli Order.

ry and the sufficiency of the evidence proffered by Plaintiffs to support it. This suggests a threshold question: may summary judgment ever be granted to a defendant in a breach of contract case where the only basis for doing so is plaintiff's inability to prove damages? On the one hand, it can certainly be argued that disputes about liability, even if "genuine," can never be "material" within the meaning of Fed.R.Civ.P. 56(c) if plaintiff cannot prove damages and, as here, is not seeking or entitled to equitable relief. In fact, the First Circuit has implicitly held that, in an action for breach of contract, a plaintiff must put forth "competent evidence" of damages in order to survive summary judgment. *See Coll v. PB Diagnostic Systems, Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995); *see also Mass Cash Register, Inc. v. Comtrex Systems Corp.,* 901 F.Supp. 404, 415 (D.Mass.1995) (holding that to recover damages in a breach of contract claim, the plaintiff must prove, *inter alia,* "damages resulting from the breach"). On the other hand, however, Massachusetts law, which governs the LLA, appears to provide that a plaintiff is at least entitled to nominal damages for a defendant's breach of contract. *E.g., Damiano v. National Grange Mut. Liability Co.,* 316 Mass. 626, 56 N.E.2d 18, 20 (1944) (holding that "[w]hen a contract has been broken by a defendant, the plaintiff 'is entitled to a verdict for nominal damages for the breach, if nothing more ...' "). If so, then the very real prospect exists that a court, counsel, and jurors could be tied up for days or even weeks or more in a trial of a case where, from the outset, no possibility exists that plaintiff will obtain any substantial relief. *But cf. Roemer v. Green Pastures Farms, Inc.,* 97 Idaho 591, 548 P.2d 857, 859 (1976) (refusing to reverse dismissal of plaintiffs' case "for mere failure [of lower court] to allow nominal damages where ... the issue is one of damages alone"); *Sessa v. Gigliotti,* 165 Conn. 620, 345 A.2d 45, 46 (1973) (stating that "[o]rdinarily, [the court] will not grant a new trial in order to entitle a plaintiff to recover merely nominal damages").

Having raised this threshold question, I am not persuaded that it is necessary to answer it at this time.[7] The only claim that Plaintiffs have asserted is one for aggregate lost profits in the amount of $63,000,000, not one for nominal damages. Indeed, it is not at all clear that Plaintiffs would want to go to the time, trouble, and expense of proceeding with a lengthy trial on the liability issues raised by Count I if there were no possibility of their recovering anything more than one dollar at the conclusion. Even if they did wish to do so and could persuade the court that they at least had a right to attempt to recover nominal damages, it might still be possible to avoid the issue altogether, if, for example, SDI were willing to make a voluntary payment (without prejudice) of one dollar to each plaintiff, thus eliminating any concern that dismissal might leave Plaintiffs with less than the full compensation to which the law entitled them.

■ Turning, then, to the merits of SDI's motion, SDI first argues that ARMS has not presented admissible evidence sufficient to demonstrate that a breach by SDI was the proximate cause of any loss of profits sustained by ARMS. *See, e.g., Hetherington & Sons v. William Firth Co.,* 210 Mass. 8, 95 N.E. 961, 964 (1911) (stating that "recovery [for prospective profits] can be had where loss of profits is the proximate result of the breach"); *see also National Controls Corp. v. National Semiconductor Corp.,* 833 F.2d 491, 496 (3d Cir.1987) (stating that "[t]o sustain a damages award, [the plaintiff] must have provided sufficient evidence from which the jury could have found that its lost profits were proximately caused by the defendant's breach"). SDI is correct, for reasons that will be better understood after consideration is given to the method by which ARMS attempts to prove its loss.

Plaintiffs' analysis begins with the fact that, in early 1992, SDI was considering acquiring from ARMS the unrestricted, exclusive right to sell Product worldwide. At that time, an SDI product manager who had no prior experience selling Product made a

---

**7.** Neither side has raised or briefed the issue of Plaintiffs' possible entitlement to nominal dam-    ages.

worldwide sales projection based on assumptions largely supplied by Swan concerning the size of various market segments (*e.g.*, U.S. military, foreign military, and commercial) and the percentage share of each segment that SDI might hope to capture. Based on these and other assumptions, SDI projected that it might sell as much as approximately $106,000,000 of Product over a five year period. As it turned out, the deal in connection with which the projection was prepared was never done. Instead, SDI acquired a limited, eighteen-month manufacturing license under which ARMS, not SDI, would continue to have primary responsibility for the sale of Product to end users. Plaintiffs nonetheless assume that the SDI sales projection, as set forth in the Marketing Plan and the Business Plan, is an equally reasonable measure of the potential sales ARMS could have expected to make over the same time period. Even beyond that, ARMS assumes that any discrepancy between the projected amount of sales and ARMS' actual sales could have been due to no cause other than SDI's breach. To complete the analysis, Plaintiffs apply what they contend is a reasonable profit margin (60%) to the entire $106,000,000 in projected sales (without any offset for ARMS' actual sales and profits during the damages period) to arrive at the conclusion that ARMS sustained lost profits in the amount of $63,660,000 as a result of SDI's breach.[8]

One would think that Plaintiffs, who are claiming lost profits that are nearly one thousand times greater than the profits they earned in their most profitable year, would make a determined effort to muster evidence to support the proposition that the discrepancy between actual and projected sales was in fact due to defendant's breach. Yet, other than an unenlightening assertion that causation involves "disputed issues of fact, and complicated issues at that," (Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Cross–Motion for Summary Judgment as to Liability at 14, Docket No. 55), there is hardly a word about causation in Plaintiffs' opposition.[9] This is especially surprising in view of the prominence that SDI gave to the issue of causation in its memorandum in support of summary judgment.

Scrutiny of Plaintiffs' responses and supplemental (and, for that matter, consolidated supplemental) responses to interrogatories also discloses little if any consideration of the issue of causation. The most complete such statement is found in response to Interrogatory No. 1 as follows:

> A.R.M.S. did not receive either the quality or quantity of products from SDI as a result of which A.R.M.S., in one instance, learned that a Sgt. Minton, U.S. Special Operations, had determined that the throw levers were not functioning properly in the hands of the U.S. troops using Colt M16 flat top receivers. A.R.M.S. was told by John Spencer that Sgt. Minton of Ft. Bragg, N.C. had a chance parking lot meeting with Col. Patterson of (DCD) Director of Combat Developments, Ft. Benning, G.A. Sgt. Minton told Col. Patterson, that the A.R.M.S. #19 Throw Lever Mounts sent to him were not functioning properly. (That mount shipment consisted of SDI produced #19 products.) Col. Patterson then directed than an experimental Hughes Aircraft designed ratchet knob device, be designated as the preferred device instead of the A.R.M.S. product being manufactured by SDI. That Directive directly and adversely affected the A.R.M.S. Throw Lever Mounts in that they were removed from the Picatinny 40,000 optic and mount program.

---

8. In 1991 and 1992, the two years immediately preceding the LLA, ARMS' net profit as a percentage of sales of all goods and services was indisputably in the range of 10%.

9. In fact, the only statement about causation appears not in the opposition section of Plaintiffs' memorandum, but in the section that purports to set forth "undisputed material facts with respect to ARMS' cross-motion for summary judgment as to liability." In Paragraph 32 of ARMS's statement of purportedly undisputed facts, plaintiffs state that "[t]he results of [SDI's] failure to perform ... are detailed in ARMS's Response and Supplemental Responses to [SDI's] Interrogatory No. 1," and in Paragraph 33 they state in conclusory fashion that the consequences of SDI's breach were that ARMS lost various sale opportunities.

It also adversely affected night vision, thermal and laser programs which shunned using the A.R.M.S. Throw Levers. Many other countries having ties to U.S. military standards either ceased to contact A.R.M.S. or ceased to order A.R.M.S. products in the volumes or manner previously enjoyed by A.R.M.S. Since A.R.M.S. has regained control of the Throw Lever Mount production and has implemented the necessary corrections, A.R.M.S. is regaining the confidence and satisfaction of the military that SDI had identified in its market surveys.

(Plaintiffs and Defendants–In–Counterclaim Responses to Saco Defense, Inc.'s First Set of Interrogatories at 6–7, Ex. F, Index of Exhibits, Docket No. 76.)

Looking beyond the jargon, what this response tells us is that a person named John Spencer (who is not otherwise identified) notified an unnamed person at ARMS that he, Spencer, had learned, at an undisclosed time and in an undisclosed manner, that a person named Sgt. Minton (who is not otherwise identified) at some unknown time told a Col. Patterson (who is said to be "Director of Combat Developments, Ft. Benning, GA." but is not otherwise identified) at a "chance parking lot meeting" that the ARMS # 19 Throw Lever Mounts were not functioning properly. Then, at some unspecified later time, Col. Patterson directed that a competitor's product rather than the product offered by ARMS be designated as a "preferred device" in connection with a particular program. From there, we are asked to accept entirely on faith Plaintiffs' foundationless assertion that the dominoes fell in rapid succession, leading to the virtual collapse of the entire U.S. military, foreign military, and worldwide commercial market for all Product.

Without belaboring the point, this is a very tenuous theory of causation. Whatever its other flaws, it is based entirely on the hearsay statement of an unidentified declarant (one John Spencer) based upon an unknown source. For that reason alone, it would be inadmissible at trial. Moreover, Plaintiffs' response does not meet the requirement of Fed.R.Civ.P. 56(c) that the party opposing summary judgment set forth "*specific* facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c) (emphasis added). Among other things, we know next to nothing about the nature or scope of Col. Patterson's authority; about what, if anything, Sgt. Minton allegedly told Col. Patterson about the nature and cause of the alleged malfunction or even how Spencer knows that a conversation between Sgt. Minton and Col. Patterson occurred at all; about why Col. Patterson designated a competitor's product "as the preferred device" and whether he would have done so even if he had not had a "chance parking lot meeting" with Sgt. Minton; about how Col. Patterson's decision regarding one particular product in one particular program affected procurement decisions by branches of the U.S. military for which Col. Patterson had no procurement authority; or about the relationship, if any, between Col. Patterson's decision, on the one hand, and the purchase of Product either by foreign military organizations or by domestic or foreign commercial users, on the other.[10] Without such information, a factfinder has no rational basis to find a causal connection between a breach by SDI and ARMS' failure to realize profits in excess of $63,000,000 from the worldwide sale of Product.

The complete absence of admissible evidence establishing a causal link between SDI's alleged breach and Plaintiffs' failure to realize the level of sales that SDI had projected is itself a sufficient basis on which to recommend the allowance of SDI's motion for summary judgment as to Count I. It is by no means the only such basis, however.

Again, without belaboring the point, there is no basis in the record to conclude that SDI had had any prior experience selling Product, that the SDI product manager who prepared the projection was qualified by training or actual experience selling Product to do so, or that the actual sales figures projected were based on anything more than an arbitrary

---

10. Mere is no indication in the summary judgment record that Plaintiffs deposed or attempted to depose Col. Patterson or any other responsible official or prospective customer in an attempt to fill in any of these gaps.

assumption regarding SDI's share of a total market of unknown size. A representative sample of this methodology appears at pages 1325–1326 of the Marketing Plan, (Ex. G, Index of Exhibits, Docket No. 76), where SDI derives projected U.S. military sales of the # 18 M21/14 Weaver Mount. The author of the projection begins his analysis with an undocumented premise that approximately 1,500,000 M14s were produced. From there, he proceeds to "assume," without any apparent factual basis, that 50% of those 1,500,000 units, or 750,000, are still in service; that 642,000 of those are in military inventory and unavailable to be fitted with the # 18 mount, thus reducing the potential market to 108,000 units; that half of those, or 54,000, actually require the # 18 mount; and that each of four competitors, including SDI, will capture 25% of that market, resulting in sales by SDI of 13,500 units of the # 18 mount at an assumed price of $110 per unit. Although each of the foregoing assumptions is critical to the analysis, not a single piece of factual support is presented to support any of them. Lacking any foundation, this projection is nothing more than an arithmetic exercise, entirely devoid of evidentiary weight or value.

There is, moreover, another insurmountable problem with the projection. It is a projection of sales by SDI, not by ARMS, and the two organizations are simply not comparable. The SDI projection was based on the assumption, *inter alia*, that SDI would not only put its existing marketing and sales resources behind the Product, at a budgeted cost of in excess of $1,000,000, but also that it would have to establish a greatly expanded network of distributors and OEMs in order to achieve the sales projected in the forecast. (Market Plan at 01795–01803, Ex. D, Affidavit of Anthony Mooney as to Plaintiffs' Exhibits Relating to Defendant's Motion for Summary Judgment and Plaintiffs' Cross–Motion for Summary Judgment as to Liability, Docket No. 56.) There is no indication in the record that ARMS, a much smaller company than SDI, could put such resources behind the sale of Product following the execution of the LLA or, more importantly, that it even attempted to do so.

There is another material respect in which sales by SDI, as projected in the Marketing Plan or Business Plan, are simply not comparable to sales by ARMS. Both the Marketing Plan and the Business Plan were prepared based on the assumption that, in order to generate the enormous volume of sales projected in both those documents, Product would have to be sold at a very steep discount from list price. For example, the Business Plan assumed that SDI would sell the # 18 M21/14 Weaver Mount to the military for a unit price of $90 and to distributors for a unit price of $85. (ARMS Presentation at 1830–1831, Ex. H, Index of Exhibits, Docket No. 76.) ARMS, on the other hand, assumed a per unit sales price of $159 for purposes of deriving its assumed profit margin. (1995 Unit Cost at 000166, Ex. I, Index of Exhibits, Docket No. 76.) If ARMS wishes to calculate lost profit per unit based on the assumption that each unit would have been sold for the undiscounted price of $159, it cannot simultaneously base its unit sales projection on a sales volume that could be achieved only at deeply discounted prices. Alternatively, if ARMS now contends that it in fact attempted to sell at the discounted prices on which the SDI projection was based and it still failed to achieve the projected sales volume, it cannot calculate lost profits based upon a profit margin that could only have been achieved if Product were sold at undiscounted prices.

The discrepancy between the unit prices of other items of Product as reflected in the Marketing Plan and Business Plan and the unit prices that ARMS used as the basis for its analysis of profit margin are even more striking. SDI's projection assumed low unit prices for items # 19, # 20, # 21, and # 37, respectively, of $75, $75, $40, and $22; ARMS assumed high unit prices of $140, $150, $75, and $29, respectively, for the same items of Product. (Marketing Plan at 1307, 1310, 1312, Ex. G, Index of Exhibits, Docket No. 76; 1995 Unit Cost at 000143, 000145, 000151, 000158, Ex. I, Index of Exhibits, Docket No. 76.) Again, ARMS cannot have it both ways; it cannot assume both high unit sales based upon the low prices needed to achieve those high unit sales, and high profit margins, based upon the high prices needed to achieve those high profit margins.

The last problem I will discuss concerns the cost assumptions upon which Plaintiffs base their calculation of ARMS' profit margin.[11] Those assumptions appear to be based on the amount Plaintiffs assumed it would cost ARMS to manufacture Product. Under the LLA, however, ARMS would not be the manufacturer; SDI would be, and it would sell Product to ARMS, presumably at a markup from its manufacturing cost so as to generate a profit for itself. The undisputed facts in the summary judgment record bear this out. It is undisputed, for example, that ARMS paid SDI either $60 or $69 per unit (depending on modifications) for the #19 Throw Lever Mount, an item of Product which alone accounts for $69,000,000 of ARMS' total purported lost sales of $106,-000,000. (A.R.M.S. Purchase Orders to Saco Defense, Ex. A to Plaintiffs and Defendants–In–Counterclaim Responses to Saco Defense, Inc.'s First Set of Interrogatories, Ex. F, Index of Exhibits, Docket No. 76.) Yet, for purposes of computing its assumed profit margin, Plaintiffs assumed that ARMS' cost for this Product would be only $42.73 per unit. (1995 Unit cost at 000158, Ex. I, Index of Exhibits, Docket No. 76.) Based on a sales price of $75 per unit (rather than the $140 per unit assumed by Plaintiffs) and a cost of $60 or $69 per unit, rather than the $42.73 assumed by Plaintiffs, Plaintiffs' profit margin, *before* taking into account any selling and distribution expenses (none of which are included in Plaintiffs' analysis), would be only 20% (75−60=15; 15±75=.20) or 8% (75−69=6; 6±75=.08), rather than the 69% on which Plaintiffs based their lost profits claim.

■ To summarize, Plaintiffs' lost profits analysis is based on a hearsay statement by an unknown declarant and thus would be inadmissible at trial. Even if it were admitted into evidence, however, it fails to provide a causal link between any breach by SDI and the loss of worldwide sales of $106,000,000

(or any other amount). Putting aside the complete absence of proof of causation, the sales figures appearing in the projection on which Plaintiffs' claim is based are entirely without foundation (and, therefore, of no evidentiary value) and, in any event, are based on assumptions regarding a level of sales and marketing activity by SDI that was far beyond the level of such activity that ARMS could or did undertake. Even if all that were not enough, the sales projection is based upon selling prices that are far below the selling prices on which Plaintiffs based their analysis of ARMS' profit margin, making the two critical components of Plaintiffs' claim (unit sales and profit margin) utterly incompatible with one another. Finally, the amount Plaintiffs assumed ARMS would pay SDI for the item of Product that Plaintiffs assumed would account for approximately two-thirds of their sales was substantially less than ARMS in fact paid SDI for such Product, resulting in a gross overstatement of ARMS' profit margin. Any one of these flaws would probably suffice as a basis for striking Plaintiffs' claim. Taken together, however, there is no question that Plaintiffs' "evidence" is insufficient as a matter of law to support the sole damage claim they are asserting in Count I. Accordingly, I recommend that SDI's motion for summary judgment as to Count I be **ALLOWED.**

With respect to Count II, SDI essentially makes two arguments: (1) that even though it fell three months behind in payments under the CA, it committed no material breach because it eventually tendered back payment in full to Swan, and he unreasonably refused to accept it; and (2) the acceleration clause in the CA is a type of liquidated damages provision which, because it imposes a penalty, is unenforceable under controlling Maine law. Disputed issues of material fact preclude the granting of summary judgment on the basis of either argument.

11. Foremost among the arguments I will not consider at this time is SDI's argument that, under the LLA, SDI was not required to accept ARMS' orders for Product, and, therefore, that Plaintiffs cannot reasonably assume that SDI would have supplied ARMS with all Product it would have needed to generate $106,000,000 in

sales, or even the $38,000,000 that Plaintiffs assume ARMS would have sold in the first two years. This argument is not frivolous, however, and should be explored fully if summary judgment is not ultimately granted to SDI on the grounds considered herein.

At least two material facts are genuinely in dispute regarding SDI's first argument. The first is whether, by the time SDI attempted to tender payment, it had already committed a material breach that relieved Plaintiffs of further obligations under the CA. *See Hastings Associates, Inc. v. Local 369 Building Fund, Inc.*, 42 Mass.App.Ct. 162, 675 N.E.2d 403, 411 (1997) (material breach of contract by one party relieves other party of any further performance obligations; whether breach is material is fact issue for jury), *rev. denied*, 424 Mass. 1108, 678 N.E.2d 1334 (1997); *Down East Energy Corp. v. RMR, Inc.*, 677 A.2d 1070,1073 (Me. 1996) (holding that plaintiffs breach of agreement entitled defendant to regard the transaction at an end, and therefore discharged any remaining duties of defendant) *citing Cercena v. Cote*, 572 A.2d 487, 489 (Me.1990). The second is whether SDI's tender of back payments was unconditional, as SDI claims, or conditioned on Plaintiffs granting SDI exclusive marketing rights on a product known as a Rigid Frame, as Plaintiffs maintain.

Several issues of material fact exist concerning the enforceability of the acceleration provision. Suffice it to say that, under Paragraph 6 of the CA, Swan was required to give priority to SDI "with respect to his time, resources, skill and diligence," and was prohibited from accepting assignments from others that might give rise to a conflict of interest between SDI and other clients. Such provision might well make it difficult to estimate what Plaintiffs' loss would be in the event of a breach or premature termination by SDI, and it might also warrant a finding that the amount claimed by Plaintiffs in damages is not unreasonable in light of the opportunities Plaintiffs were agreeing to forego, even assuming the acceleration provision would be considered a liquidated damages clause under Maine law.[12]

I therefore recommend that SDI's motion for summary judgment as to Count II be **DENIED**.

12. Plaintiffs appear to acquiesce in the characterization of the acceleration provision as a liquidated damages clause, notwithstanding that it might also be viewed as a conventional, fixed

(b) *Plaintiffs' Cross–Motion for Partial Summary Judgment*

As noted, Plaintiffs' cross-motion for partial summary judgment as to liability was untimely and, therefore, is not properly before the court. Even if it were to be considered, however, it is clearly deficient for the simple reason that, with one possible exception, neither Plaintiffs' motion nor Plaintiffs' supporting memorandum sets forth specific facts upon which Plaintiffs base their contention that a breach of the LLA occurred at all. The one possible exception concerns SDI's purported failure to fulfill its delivery obligations to Israel, but dealings between SDI and Israel are not part of this case. Moreover, SDI cites ample evidence in the summary judgment record to support its contention that any problems SDI might have had manufacturing Product and filling orders in a timely manner were due to factors for which Plaintiffs were responsible, such as design defects and defects in the technical information supplied by Plaintiffs. (*E.g.*, Def.'s Opp. to Pls.' Cross–Motion at 7–11, Docket No. 77.) As for the CA, I have already noted that disputed issues of material fact exist about whether SDI's breach was material and whether, assuming it was not, SDI made an unconditional tender of the back payments necessary to cure the breach.

For all the foregoing reasons, Plaintiffs' motion for partial summary judgment as to liability should be **DENIED**.

## III. *CONCLUSION AND RECOMMENDATION*

For all the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (Docket No. 48) be **ALLOWED** as to Count I of Plaintiffs' Verified Complaint and **DENIED** as to Count II; I recommend that Plaintiffs' Cross–Motion for Summary Judgment (Docket No. 55) as to liability be **DENIED**; and I order that Defendant's Motion to Strike (Docket No. 60) be **ALLOWED** in part and **DENIED** in part, as discussed more thoroughly above.

sum retainer, paid by SDI to assure it that Plaintiffs would be available at all times during the term of the CA to assist them and that they would not offer their services to a competitor.

## IV. *IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 471–472, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).