King, J.
The plaintiff obtained ajudgment for damages and costs in the amount of £5,019,301, in a British case, Union Camp Chemicals Limited v. CRL TCL Limited, f/k/a Todd Combustion, Limited, in London, England. This judgment has been satisfied in part through insurance and assets, but £931,107[2] remains outstanding. The plaintiff asserts that there are presently monies and credits of approximately $4.3 million available to satisfy the judgment in the possession of the defendant State Street Bank under the terms of a contract entitled First Amended Escrow Agreement, effective April 25, 2000. The other defendants all claim their own interests in the same funds. A writ of attachment on trustee process was most recently issued December 19, 2002. This matter is now before the court on the plaintiffs renewed motion for summary judgment and defendants Todd Credfield Acquisition Company, Inc. and Todd Combustion, Inc.’s cross motion for summary judgment. After hearing and consideration of the arguments of counsel, the court, for the reasons that follow, will grant plaintiffs motion for summary judgment and deny the cross motion for summary judgment.
BACKGROUND
The material facts are not in dispute. Union Camp Chemicals Limited (“UCC”) purchased a boiler from Todd Combustion, Ltd. (“Todd UK”[3]), a British company. The boiler was installed at UCC’s chemical processing facility in County Durham, England. On January 28, 1997, the boiler exploded, resulting in extensive damage. At the time of the explosion, Todd UK was a subsidiary of Todd US.[4] In March of 1997, UCC gave written notice that a claim for damages arising out of the explosion was being asserted against Todd UK.
On April 12, 1999, Todd UK and Todd US each entered into separate agreements to sell certain assets to John Zink Company, Ltd (“Zink UK”) and John Zink Company, LLC (“Zink US”[5]), respectively. Both Zink companies are owned by Koch Industries, Inc. Both purchase agreements include a schedule of the legal proceedings known to be outstanding at the time of the closing. Todd UK lists two potential liabilities, one of which is, “Potential insurance claim related to Todd regarding boiler explosion on 28 January 1997 at Union Camp Chemicals.” Todd US lists one hundred and thirty potential liabilities, almost all of which relate to potential asbestos-related liability actions. Claim 128, however, is listed as, “Potential insurance claim related to Todd Combustion Limited regarding boiler explosion on January 28, 1997 at Union Camp Chemicals.” Both Todd UK and Todd US were therefore aware of the incident and the potential for legal claims against them arising out of the explosion at the time of their asset purchase by the Zink companies.
In addition to the separate asset, purchase agreements, on April 12, 1999 Todd UK, Todd US, Zink UK, Zink US, and Exeter Venture Lenders, L.P. entered into an escrow agreement with State Street Bank and Trust Company (“State Street”) as escrow agent. The purpose of this agreement was to set aside certain funds from the purchase price for indemnification against potential third-party claims related to Todd, some of which had been assumed by Zink, for a period of four years. The parties further amended this agreement on April 25, 2000, resulting in the First Amended Escrow Agreement (“Escrow Agreement”) discussed herein.
Under the Escrow Agreement, either the sellers or the purchasers can make claims against the escrow funds during the term of the escrow. Claims by the sellers are governed in part by § 10.2(d) of both the US and UK purchase agreements. These nearly identical clauses provide, in relevant part, that,
With respect to liabilities retained by Sellers . . . Purchaser agrees that if any third party claims [or lawsuits] are brought against Sellers arising out of occurrences prior to, concurrent with, or subsequent to the Closing Date resulting from, arising out of or incident to the operations of the Business prior to the Closing, Sellers may make a claim against the Escrow Account to partially or fully satisfy any such claims or lawsuits to the extent not paid by any available insurance proceeds in accordance with the terms of the Escrow Agreement.
Section 3.1 (b) of the Escrow Agreement provides the procedure for the sellers, including Todd UK, to file such a claim against the escrow account. Written notice must be given to State Street, Exeter, and Zink which shall briefly set forth the basis of the claim and, *668 if possible, a reasonable estimate of the amount, which may include attorneys, accountants’ and other fees or expenses incurred to resolve the claim. Upon receiving such notice, State Street shall hold separately from the general escrow funds an amount equal to the claim. Any proceeds that Todd UK might obtain through an escrow claim such as this, “shall be utilized solely to pay liabilities to unaffiliated third parties.”
Section 3.2(b) of the Escrow Agreement addresses when State Street may distribute funds which have been claimed by a seller. Zink is allowed twenty days to respond to the claim in writing. If it authorizes the claim, the funds shall be disbursed to the extent available. If it makes no response, the funds shall be disbursed to the extent available at the end of the twenty days. If Zink objects to the claim, it must do so with specificity as to what amount, if any, it agrees the seller is entitled. State Street shall then disburse the agreed to amount to the extent available.
Section 3.3(b) addresses how a dispute amongst the parties regarding the validity of an escrow claim by a seller is to be resolved. Within fifteen days of when the seller receives a written obj ection from Zink, the sellers and the purchasers must, “attempt in good faith to agree upon the rights and obligations of the respective parties” with respect to the claim. If they fail to agree, as is the case in the matter before the court, the dispute shall be settled by:
(a) mutual agreement of Purchaser and Sellers, evidenced by single written instructions to the Escrow Agent, (b) a binding and final arbitration award, provided the Parties have agreed to arbitration with respect to the matters in dispute, or (c) a final judgment, order or decree of a court of competentjurisdiction in the United States of America (the time for appeal therefrom having expired and no appeal having been perfected), all costs and expenses of which (including reasonable attorneys fees) shall be borne as provided in the applicable Purchase Agreements or, failing any such agreement therein, by the party against whom the dispute is settled as aforesaid.
The Todd UK purchase agreement does not contain any provision regarding allocation of costs and expenses in the case of litigation between Todd UK and Zink to enforce an escrow claim, so costs of this action are to be borne by the party against whom the dispute is settled.
No provision is made anywhere in the Escrow Agreement for an objection by Todd US to be made regarding an escrow claim asserted by Todd UK. Both are “sellers” under the terms of the Escrow Agreement and the agreement only allows objection to seller claims to come from “purchasers,” in this case, Zink.
Under the terms of §4.4 of the Escrow Agreement, State Street is to deliver the funds due on a finalized escrow claim, “(p]romptly after ... a notice of the determination of such a Claim in accordance with the provisions of Section 3.3 hereof . . .” If the amount then in escrow is less than the amount of the claim, State Street is to release the entirety of the amount in escrow.
The Escrow Agreement in §6 provides for the payments of fees to State Street directly from the escrow account. It states that such fees shall not exceed $7500 per calendar year without written approval of Todd and Zink. It further specifies that such fees and expenses are, “secondary to any Purchaser Escrow Claim or Seller Escrow Claim.”
The defendants cite numerous other provisions of the Escrow Agreement, but none are materially relevant to this action.
The escrow account received $4 million as a cash deposit from the purchase price of the assets of Todd US and the parties specified that certain accounts receivable would be deposited into the escrow by both Todd and Zink as they were received. The Escrow Agreement provided for two early release dates of escrow funds, providing the remainder of funds would cover all outstanding potential escrow claims by the sellers or purchasers. These were to be on April 12, 2001 ($856,524) andApril 12, 2002 ($1.5 million). The affidavit of Maureen McNamara (attached to the Declaration of Jonathan F. Mitchell) states that these disbursements never occurred and that the only withdrawals from the escrow account have been for tax distributions to Todd US and direct payment of escrow fees to State Street.
The escrow as a whole will terminate on April 12, 2003, at which time whatever funds remain will be available to the sellers as further funds toward the purchase price of the assets sold to Zink. It is estimated that the escrow account now contains in excess of $4.3 million.
Finally, in addition to the above arrangements, on April 12,1999, Todd US and Todd UK also entered into a side agreement (‘Todd Agreement”) regarding the distribution of certain escrow funds. It states that, “WHEREAS, the Escrow Agreement provides that the Escrow Funds . . . shall be released to ‘the entity or entities designated in writing by the Sellers’ ” the parties to the Todd Agreement wish to designate the entities in advance. The language quoted from the Escrow Agreement comes from §§4.3 and 4.3A, governing early release distributions and residual distribution after the close of the escrow term. The Todd Agreement continues to provide that funds distributed in this fashion which are deemed to be part of the initial $4 million cash deposit are to go exclusively to Todd US; funds deemed to be part of the accounts receivable deposits, “shall be allocated between Todd US and Todd UK in proportion to the amount of Accounts Receivable then collected on behalf of Todd US and Todd UK, respectively.”
*669 On December 21, 1999, UCC commenced an action against Todd UK and its subcontractor, Auto-Flame, Ltd., in London, England before Judge Thornton QC, in the High Court of Justice, Queen’s Bench Division (Claim number HT 99000279). This lawsuit alleged that materials and services provided by Todd UK caused the explosion at UCC’s chemical processing facility on January 28, 1997 to occur, resulting in damages in excess of £7 million.
Because of a variety of claims related to the boiler explosion, Todd UK began to pursue recovery from its primary insurer, Independent Insurance Company, to recover some of its losses. After litigation, Todd UK received the sum of £1 million on June 28, 2000 and recovered a stipulated amount of litigation costs. UCC was a party to this action and also recovered a stipulated amount of costs.
On July 28, 2000, UCC first wrote to State Street to notify them of a potential claim against the escrow account. On August 4, 2000, UCC obtained summaiy judgment in its action against Todd UK for damages to be assessed and that determination was made in an order dated May 4, 2001. Todd UK had until May 14, 2001 to appeal this determination, but no appeal was taken. The suit against Auto-Flame was settled.
At the same time, UCC was pursuing compensation from ACE-Cigna, Todd UK’s secondary insurer, which the British Court eventually found to be also liable to Todd UK and therefore to UCC for a portion of the damages. Judgment was entered in UCC’s favor on June 20, 2001. An appeal was filed by the ACE-Cigna, but a settlement was eventually reached on February 26, 2002 after prolonged negotiations.
Todd UK was, by this point, in liquidation, the British equivalent of bankruptcy. Following the settlement with ACE-Cigna, UCC and the liquidators of Todd UK reached a settlement of their own, whereby Todd UK, in relevant part, accepted that the other settlement was made in good faith and fairly reflected the litigation risk associated with an appeal.
Todd UK’s current liability to UCC is calculated thoroughly in the July 22, 2002 affidavit of John Paul Startin whose methodology is uncontroverted by any credible evidence. The court sets forth here only an overview of its conclusions. Todd UK’s gross liability to UCC as of July 22, 2002 was in the amount of £5,019,301. The settlement proceeds from ACECigna, £3,219,965, must be deducted from this, leaving Todd UK’s net liability at £1,799,336, which is composed of principal, costs, and interest.
The net liability must be further reduced by the amount UCC expects to receive from Todd UK’s liquidation. According to the report of the liquidators, the amount received through liquidation will be no more than £868,229. This leaves a claim by UCC against Todd UK in the amount of £931,107 composed of principal, costs, and interest plus statutory judgment interest from July 22, 2002, the date of Startin’s calculations.
Postjudgment interest is set at the rate of 8% under British law pursuant to the Judgments Act of 1838, §17 and Civil Practice Rule 40.8. This interest is only to be calculated on the remaining principal and costs, not the interest compounded. Eight percent annual interest on the portion of Todd UK’s net liability made up of principal and costs (£1,409,340) amounts to £309 daily from July 22, 2002 to the date of payment.
The declaration which Mitchell filed on behalf of Todd US in opposition to UCC’s renewed motion for attachment includes a copy of a calculation done by Todd UK of its liability to UCC as of August 2, 2002, for purposes of making a claim against the escrow account. This calculation is not in complete agreement with Startin’s affidavit. Mitchell is able to aver that this is an accurate copy of a letter he received, but he has no direct knowledge of its contents or their accuracy and so this exhibit would be inadmissible.
Regardless, the Startin affidavit and the letter prepared by Todd UK agree on all the initial figures for Todd UK’s liability to UCC. The discrepancy between the two calculations primarily arises due to Todd UK reducing its claim against the escrow account by the £1 million, which it received from Independent on June 28, 2000, before UCC’s British Court judgment against Todd UK was obtained. This amount was meant to cover any and all liability which might arise out of the explosion. There is no assertion that the £1 million was ever turned over to UCC and any such transfer would have been accounted for in the subsequent liability determination of the British Court issued on May 4, 2001. If any part of the proceeds from this action remain in the hands of Todd UK, they are accounted for by Startin as part of Todd UK’s liquidation proceeds. The Todd UK escrow claim letter does not detail the liquidation proceeds at all. The other discrepancies between the two calculations are due to differences in interest calculation and in this instance, the Startin affidavit generally favors the defendants, as compared to the Todd UK analysis. The court therefore accepts Startin’s calculation of liability.
On August 2, 2000, before the final British order was issued, UCC filed the initial complaint in this action with this court, seeking to impose an equitable lien against the escrow account held by State Street pursuant to the Escrow Agreement discussed above. The first amended complaint was filed August 8,2000. On January 11, 2001, UCC filed its first motion for summaiy judgment pursuant to Mass.R.Civ.P. 56. On February 13,2001, the court issued an attachment on trustee process against the escrow account. On March 30, 2001, the attachment was dissolved in response to the defendants’ motion for reconsideration. At the same time, the parties’ cross motions for summaiy judgment were denied without prejudice. Judge Fahey held at that time that the parties could refile the *670 motion, “at such time that the order in England against Todd UK is final and no appeal taken (or that judgment is upheld on appeal) or when all appropriate claimants to the funds in the escrow account and their rights can be established.”
UCC filed a motion to reconsider the dissolution of the attachment on April 12, 2001. On May 14, 2001 Judge Fahey denied this motion without prejudice, holding that, in light of an affidavit submitted by Startin at that time, Todd UK had until May 14, 2001 to appeal the British judgment, and therefore the motion for attachment had been premature. The plaintiff subsequently filed a renewed motion for writ of attachment on trustee process and a renewed motion for summary judgment on October 14, 2002, after settlement negotiations with Todd UK were complete.
DISCUSSION
I. Standard of Review
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Under G.L.c. 235, §23A, any final and conclusive foreign judgment which would be enforceable where rendered, “shall be enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit.”
The US Purchase Agreement states that it is to be governed by New York State law. The UK Purchase Agreement states that it is to be governed by the laws of Britain. These provisions are not relevant because this action is directed against the escrow account, which is held by State Street in Boston, Massachusetts. The Escrow Agreement states that disbursement controversies may be settled under its terms by any court of competent jurisdiction in the United States. For this reason, the laws of the Commonwealth govern.
II. Application
The matter before the court is essentially one of contract interpretation. Though the escrow agreement entered into by the defendants is complicated, it is not ambiguous, and reasonable, informed people could not differ on the meaning of its terms. Disagreement amongst the parties regarding the meaning of an agreement does not itself make the agreement ambiguous. “(A]n ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other.” Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995). Interpretation of a contract without ambiguous terms is a matter of law for the court to determine. Hastings Associates, Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass.App.Ct. 162 (1997).
A.Finality of the British Judgment
When the plaintiff previously filed for summary judgment, it was denied without prejudice because the British judgment it sought to enforce was not yet final and conclusive as required by G.L.c. 235, §23A. The judgment became final when no appeal was taken within the statutory timeframe. The amount of debt still owed to UCC as a judgment creditor of Todd UK became certain with the report of the liquidators dated July 12, 2002, which is attested to in the Startin affidavit. The defendants have offered no credible evidence to contradict this affidavit.
B.Standing
UCC is a judgment creditor of Todd UK and can therefore reach any non-contingent interest in property held by Todd UK, irrelevant of its form. UCC claims that Todd UK’s interest in the escrow funds was perfected under the terms of the escrow agreement when the British judgment became final and no longer subject to appeal on May 14, 2001.
On the facts of this case, the court has common-law equitable power to reach and apply Todd UK’s assets in the State Street escrow account. Such an action lies when the debtor possesses properly or a right which cannot be reached or taken on an execution in an action at law. For a general discussion of the court’s jurisdiction in equity on these matters, see Foster v. Evans, 384 Mass. 687, 691-92 (1981), citing Parkhurst v. Almy, 222 Mass. 27, 33 (1915) (“[A] creditor who has reduced his claim to a judgment. . . can . . . maintain a bill in equity to reach and apply in satisfaction of it property which cannot be taken on execution at common law”). Todd UK’s full exercise of its right to reimbursement sufficient to satisfy its liabilities to UCC is just such a properly or right. UCC in this action is not asserting its own rights as a third party to the Escrow Agreement, but rather Todd UK’s rights as a primary.
C.The Escrow Agreement
1. Parol Evidence
The defendants submit extensive testimonial evidence from parties to the escrow agreement concerning the intent of the Escrow Agreement which differs from the clear and unambiguous language of the written agreement. Once an agreement or transaction has been embodied in a writing, however, no extrinsic *671 evidence is allowed to show that the true agreement of the parties was different from the agreement set forth in the writing. Tilo Roofing Co. v. Pellerin, 331 Mass. 743 (1954). When a particular topic is dealt with in the writing, such as the method of processing a seller’s claim against the escrow account, it is presumed that the writing contains the entire agreement of the parties on this subject. Loveland v. Epstein Drug Co., 227 Mass 311, 315 (1917). This is a long-standing rule of substantive law. The language of the Escrow Agreement is clear on its face and the court will not base its interpretation of the writing on inadmissible parol evidence.
2.Notice
The Escrow Agreement does not restrict reimbursement to claims about which Todd or Zink were notified before the date of the agreement. It speaks, rather, of “any third party claims [or lawsuits] brought against Sellers arising out of occurrences prior to, concurrent with, or subsequent to the Closing Date resulting from, arising out of or incident to the operations of the Business prior to the Closing.” In any event, the boiler explosion of January 28, 1997, the factual predicate for UCC’s claim, appears as a potential liability on schedules attached to both the Todd US and Todd UK purchase agreements.
3.Satisfaction Through Insurance
Section 10.2(d) of the UK purchase agreement hooks the Escrow Agreement into that contract, establishing under what circumstances a seller escrow claim is valid. It states that, “Sellers may make a claim against the Escrow Account to partially or fully satisfy any such claims or lawsuits to the extent not paid by any available insurance proceeds . . .” (Emphasis added.) Tódd UK recovered funds regarding the boiler explosion up to the policy limit from Independent Insurance after obtaining a court order. ACE-Cigna, Todd UK’s secondary insurer, was pursued by UCC in a British Court. UCC eventually obtained judgment, but ACE-Cigna appealed. After protracted negotiations, they were able to reach a settlement for 70% of the initial trial verdict. Barring fraud or collusion, for which the defendants have not introduced any credible evidence, such a recovery more than satisfies the requirement that the extent of available insurance proceeds be determined before an escrow claim can be made.
4.Amount of Indemnification Allowed
The defendants urge that the Todd Agreement controls disbursements under the Escrow Agreement’s seller claims provision. This is in contradiction to the plain language of both agreements and therefore unpersuasive.
As noted above, the Todd Agreement states that, “WHEREAS, the Escrow Agreement provides that the Escrow Funds . . . shall be released to ‘the entity or entities designated in writing by the Sellers’. . .” The language is drawn from §§4.3 and 4.3A of the Escrow Agreement which governs distribution of residuals after the close of the escrow term as well as at early release dates. This section does not mention nor does it govern distributions pursuant to seller or purchaser claims against the escrow funds for satisfaction of a third party liability.
The Todd Agreement continues to provide that funds distributed by the operation of §§4.3 and 4.3A and deemed to be part of the initial $4 million cash deposit are to go exclusively to Todd US and that funds deemed to be part of the accounts receivable deposits, “shall be allocated between Todd US and Todd UK in proportion to the amount of Accounts Receivable then collected on behalf of Todd US and Todd UK, respectively.” From this the defendants argue that all disbursements from the escrow account, including those made pursuant to a seller claim to satisfy a third-parly liability, may only be distributed in up to the amount contributed to the escrow account directly by that seller. There is no support in the Escrow Agreement or the Todd Agreement for this contention.
The defendants’ reading of the Todd Agreement would contradict §3.1(b) of the Escrow Agreement itself as well, which states that funds obtained through an escrow claim, “shall be utilized solely to pay liabilities to unaffiliated third parties.” The Todd Agreement’s assignment of rights to disbursals between the various Todd companies would be nonsensical and in contradiction of the clear language of the §3.1(b).
The Todd Agreement is therefore irrelevant to this action and there is no necessity that a seller’s claims against the escrow account be at all proportionate to its contributions.
5.Priority of Claims
Through the affidavit of Don M. Kennedy, Zink asserts that there have been numerous claims already made against the escrow account by itself, Todd US, and Todd UK, in excess of the $4.3 million or more the fund contains and that all these claims must be balanced against the others. The defendants assert that since claims have been made in excess of the assets of the escrow account, all parties must wait until the escrow term expires on April 12, 2003 and distribute the funds in a pro rata fashion. The defendants are mistaken.
Under the terms of the Escrow Agreement, the first in time scheme for reimbursement is clear. Once a finalized claim is made upon the escrow funds, based on a final judgment, decree, order, or settlement and including the exhaustion of insurance proceeds as required by the purchase agreements, §3.2 of the Escrow Agreement controls. Unless objection is made, the funds are to be delivered to the claiming party no later than twenty days after the claim is submitted. UCC is Todd UK’s judgment creditor and it made a *672 claim against the escrow account standing in Todd UK’s shoes to enforce the final judgment of the British Court as embodied in their settlement with Todd UK. Zink objected and the parties have not been able to work out an agreement. Section 3.3 states clearly that when such a dispute arises, “a final judgment, order or decree of a court of competent jurisdiction in the United States of America (the time for appeal therefrom having expired and no appeal having been perfected)” will determine the final validity of a claim. The Escrow Agreement offers no further impediments to delivery of the funds thereafter. If this matter is decided in favor of the plaintiff in this court, the funds would be deliverable as soon as the time for appeal expires if no appeal is perfected. There is no further impediment to distribution than that.
There is no support whatsoever regarding the defendants’ contention that all claims must wait to be balanced against each other at the expiration of the escrow term. Rather, §4(d) provides that, “if at the Termination Date there are any pending claims or lawsuits with respect to liabilities” at least $50,000 shall be retained in the escrow account “for the purpose of covering potential [claims].” (Emphasis added.) It further provides that, “[a]n amount equal to the actual judgment, decree, order, or settlement for each claim or lawsuit shall be released pursuant to Section 3" as outlined above, which is a first-in-time scheme. UCC’s claim against Todd UK is not pending nor potential, but final. Funds equivalent to Todd UK’s net liability should have been set aside as soon as the British judgment was no longer subject to appeal. Even, however, if UCC’s claim were merely potential, the distribution is governed by §3, not some pro rata balancing scheme.
Section 4(d) further provides that at the end of the escrow term, the balance of the escrow; account, if any, “shall be released to Sellers upon final resolution or settlement of all pending claims.” The release of these residuals, as well as the potential early releases, is what is governed by the Todd Agreement the defendants rely so heavily on, not the seller or purchaser escrow claims. This side agreement provides that Todd UK and Todd US will share in the early releases and residuals in a manner proportionate to their contributions to the escrow account through accounts receivable and the initial $4 million cash deposit from Todd US’s purchase price.
Nonetheless, the Kennedy affidavit claims that a significant number of liability claims were filed before the claim by UCC on Todd UK’s behalf and that these must take precedence. Upon a close reading of the documents, it is clear that almost all of the claims referenced by Kennedy’s affidavit are not yet perfected as required by the Escrow agreement, but are still merely pending or potential in nature. The court will address each of the claim letters submitted with the Kennedy affidavit in sequence.
The Todd US escrow claim notification of December 12,2000 is exclusively regarding non-perfected claims lacking the finality required for disbursement. The asbestos litigation expenses claim states that, “liability from these matters may be in excess of $5 million, over and above the coverage of any applicable insurance.” The SSW v. Holly Sugar Corp. claim admits that, “[t]otal liability and related costs cannot be estimated at this point.” The City of Vineland v. Day & Zimmerman claim notes that, “[d]amages and fees in this matter might range from $500,000 to $1 million or more.” Finally, Todd US has submitted a claim to recover attorneys fees in this action with UCC, saying that they “might exceed $500,000.” None of these claims have the certainty and finality necessary to require distribution under the Escrow Agreement.
On December 27, 2000, Todd UK submitted four claims of its own. Three of the claims were subsequently withdrawn as having been satisfied by insurance in a notice letter dated August 2, 2002. The fourth claim is for attorneys fees incurred in this action by UCC to enforce the Escrow Agreement, which certainly were not finalized and certain in December 2000, so it itself was inchoate.
On January 23, 2001, Zink sent notice of its own claims against the escrow account. Four of the claims listed include the admission, “The amount of Zink US’s claims against Todd US and the Escrow Fund is yet unknown as total liability and related costs cannot be determined at this time.” The final claim, related to an arbitrator’s award in Visy Paper v. The McBurney Corp., seems perfected and subject to distribution under the Escrow Agreement in the amount of $75,000. It is not clear from the record if Todd has objected to this distribution; if there was no objection, but State Street has nonetheless failed to make a distribution as required when presented with a finalized claim; or if the distribution has in fact been made. The status of the Visy Paper claim, however, is irrelevant to the matter before the court. Since the entirety of the claim amounts to $75,000, even if this claim does have priority in time over that of UCC, it will not affect UCC’s recovery from the escrow account which is currently estimated to contain in excess of $4.3 million.
It is clear form the plain language of the Escrow Agreement that claims are to be paid as they become choate and finalized, and, once finalized, §4.4 of the Escrow Agreement requires that State Street is to deliver the funds due, “[p]romptly after ... a notice of the determination of such a Claim in accordance with the provisions of Section 3.3 hereof...” Nothing in the agreement states or implies that claim funds will not be disbursed until after the end of the escrow term.
6. Escrow Agent’s Priority
State Street argues that under §6 of the Escrow Agreement, any fees owed to the escrow agent must be paid before any third-party claims are released. *673 Section 6 states that such claims for fees are, “secondary to any Purchaser Escrow Claim or Seller Escrow Claim.” Contrary to this court’s order for attachment of trustee process on December 19, 2002, it has become clear that State Street’s claim to fees does not take priority over UCC’s claim to a distribution from the escrow account. UCC is not seeking the disbursement in its own right, but rather as the judgment creditor of Todd UK. By standing in Todd UK’s shoes to enforce its rights, it also gets the privilege of priority attached to a seller escrow claim which was filed directly by the seller.
D. Further Discoveiy
The defendants claim that summaiy judgment at this stage would be premature because insufficient discovery has been conducted. Notice of UCC’s claim against Todd was provided in March of 1997 and was included in the schedules of potential liability incorporated in the purchase agreements signed April 12, 1999. This case was filed on August 2, 2000. It has been ripe for judgment since the British judgment became final on May 14, 2001. By the defendants own admission, they have briefed this motion no less than five times.
The only material discoveiy sought by the defendants relates to insurance proceeds which were recovered by the plaintiff as compensation for damage arising out of the boiler explosion. The defendants have had sufficient time to conduct discoveiy on this issue, as this case has been pending for over two years and the explosion which forms the basis of UCC’s judgment occurred in January of 1997, a full six years ago. The court believes the record has been developed sufficiently to allow summaiy judgment to enter.
ORDER
For the foregoing reasons, it is hereby ORDERED that summaiy judgment be ALLOWED in favor of Union Camp Chemicals Limited against State Street Bank and Trust Company in the amount of £931,107 plus interest in the amount of £309 per day calculated from July 22, 2002 to the date of payment[6] or the equivalent in U.S. dollars, determined by the exchange rate in effect on the day of or the day before payment (see Manches & Co. v. Gilbey, 419 Mass. 414 (1995)), payable from the remaining balance in the escrow account. This is to be done before the distribution of any fees owed to State Street Bank and Trust Company under §6 of the First Amended Escrow Agreement.
Within thirty days of the daté of this order, the plaintiff, in accordance with §3.3(b) of the First Amended Escrow Agreement and Superior Court Rule 9A, may file a motion for an order awarding costs and expenses, including reasonable attorneys fees, supported by an affidavit.

Tthis amount was converted by the plaintiff to U.S. dollars using the Late NY exchange rate published in the July 29, 2002 Wall Street Journal of 1.5655 $/£. The amount then converted equaled $1,457,648.

Todd UK refers collectively to both Todd Combustion Ltd and Camtorc Limited, another British Todd company.

Todd US refers collectively to both Todd Combustion, Inc. and Todd Credfield Acquisition Company, Inc., another American Todd company. Todd UK and Todd US together in their entireiy are referred to as Todd.

Zink UK and Zink US together in their entirety are referred to as Zink.

Eight percent interest on principal and costs from the date of judgment is what is required by British law. The initial amount requested by UCC in this action included 8% interest from the date of judgment to July 22, 2002, the date the affidavit showing the debt calculation was prepared. Interest from July 22, 2002 to the date of payment must be added in order to make UCC whole.